**Robert J. HENNESSY, Plaintiff, Appellant,**

v.

**CITY OF MELROSE, et al., Defendants, Appellees.**

No. 98–2011.

United States Court of Appeals, First Circuit.

Heard Sept. 16, 1999.

Decided Oct. 22, 1999.

---

William P. Monahan for appellant.

Regina M. Gilgun, with whom Douglas I. Louison and Merrick, Louison & Costello were on brief, for municipal appellees.

Salvatore M. Giorlandino, Assistant Attorney General, with whom Thomas F. Reilly, Attorney General of Massachusetts, was on brief, for remaining appellees.

Before SELYA, Circuit Judge,
COFFIN, Senior Circuit Judge, and
LIPEZ, Circuit Judge.

SELYA, Circuit Judge.

This appeal implicates the delicate balance between the need of educational institutions to have a relatively unfettered hand in order to perform their core mission effectively and the rights of teachers (and aspiring teachers) freely to express themselves. On particular facts, the district court reconciled that balance against plaintiff-appellant Robert J. Hennessy. At the same time, the court rejected several other claims that Hennessy had brought. Hennessy now appeals. We affirm.

## I. BACKGROUND

In accord with the summary judgment standard, we limn the facts as hospitably to the appellant's claims as the record permits, indulging all reasonable inferences in his favor. *See Coyne v. Taber Partners I*, 53 F.3d 454, 456 (1st Cir.1995).

The Commonwealth of Massachusetts operates Salem State College. Matriculation there offers students, inter alia, the opportunity to obtain both a baccalaureate degree in education and a teaching certificate (a sine qua non to securing a faculty position in a public school within the Commonwealth). The issuance of such a certificate, in turn, hinges on successful completion of a student teaching practicum.

When the events giving rise to this suit transpired, the appellant had completed three years of a four-year curriculum at Salem State. In the first semester of his senior year, he enrolled in a class on multiculturalism taught by Dr. Mary–Lou Breitborde, the chair of Salem State's Department of Education. Over the course of the semester, Breitborde became concerned about the appellant's unusually forceful espousal, at inappropriate times, of religiously oriented views on subjects such as homosexuality and abortion (e.g., his submission of a paper wrapped in a picture of a fetus, even though the paper had nothing to do with reproductive rights). In light of these experiences and corroborative reports received from other docents, Breitborde met with the appellant to address his suitability for pursuing a teaching career in the public schools.

At the meeting, Breitborde expressed concerns about the appellant's ability to adhere to state-mandated professional standards, especially in regard to respect for diversity among school children. When she specifically asked for an assurance that he would refrain from proselytizing in the classroom, he indicated that such an assurance would be hard to provide in view of his strong belief that children should regard Jesus Christ as their salvation. The audience concluded with Breitborde's statement that she would need to ponder whether the appellant could continue in Salem State's teacher certification program. A faculty member subsequently told Breitborde that the appellant had completed an earlier part-time placement in a public school without incident. This piece of information apparently tipped the balance and she decided to give him the benefit of the doubt.

In January of 1996, Salem State, acting with Breitborde's approval, placed the appellant at the Horace Mann Elementary School, Melrose, Massachusetts, for a student teaching practicum, and assigned him to assist Richard McDermod in instructing a fourth-grade class. Dr. John Mangini, a Salem State faculty member responsible for evaluating the appellant's performance at Horace Mann, reported during the initial stages of the practicum that he was doing well.

In March, the situation began to deteriorate. Four incidents occurred. We summarize what the record shows.

—**The Everson Conversation.** During a conversation that took place on an undetermined date, the appellant showed a picture of an aborted fetus to a teacher, Carol Everson. His behavior and demeanor frightened Everson and she voiced her trepidation to Horace Mann's principal, Dr. Judy DeLucia.

—**Family Fiesta Night.** On March 26, the appellant balked at participating in a multicultural assembly called "Family Fiesta Night"—an event in which his fourth-grade class was actively involved. When McDermod directed the appellant to attend, he did so grudgingly. Once there, he called the dancing "silly" and "inappropriate," and left almost immediately. He made no bones about the fact that he considered the performances lewd and offensive to principles of "biblical sobriety."

—**Regarding Art.** Three days later, the appellant's class attended a presentation by parent volunteers entitled "Regard-

ing Art." One of the presenters introduced a well-known painting by Renato Cesaro which parodied a traditional (Leonardo da Vinci) rendition of the Last Supper and depicted Hollywood stars in lieu of Christ and the apostles. The appellant termed the display "disgusting," branded the Cesaro painting "obscene," and stormed out of the class. He did not return for over an hour. Thus, he was not available to conduct a previously scheduled teaching assignment and McDermod had to pinch-hit for him.

—**The DeLucia Interview.** The contours of the practicum called for the appellant to function as the fourth-grade class's sole instructor during the following week. Worried about that configuration in light of recent developments, McDermod expressed his concerns to DeLucia. At about the same time, the parent who had introduced the Cesaro painting told DeLucia that she would not be comfortable with the appellant handling her son's class. DeLucia nonetheless permitted the appellant to take over the class on Monday, April 1. In mid-day, she summoned him to her office and inquired about the Family Fiesta Night and Regarding Art episodes. The appellant explained that "you can't serve God and Mammon," that he had chosen the former, and that he was more interested in pleasing God than in pleasing the principal. According to DeLucia, he then stated that he viewed her as "the devil" and the Horace Mann faculty as her disciples. When the appellant persisted in arguing that it was wrong to allow religion to be denigrated in the public schools, DeLucia terminated the interview and the appellant returned to his fourth-grade class.

On the afternoon of April 1, DeLucia instructed the appellant to meet with the school superintendent. He declined, indicating that he first wanted to discuss the matter with his priest. DeLucia then told the appellant that he could not resume practice teaching until a consultation took place with Salem State. She simultaneously notified the local police department that she was concerned about his erratic behavior.

The next day, DeLucia informed a Salem State official that the appellant would not be allowed to continue his practicum. In a follow-up letter, she cited the four incidents catalogued above. Salem State promptly convened a meeting of faculty members and administrators who decided that the appellant's behavior, as reported, appeared to violate numerous provisions of the applicable student code of conduct. On this basis, Salem State temporarily suspended the appellant and notified him that he was entitled to an immediate hearing. The suspension was carried out in accordance with the student judicial system's emergency procedures.

The appellant contacted the appropriate college official and learned the nature of the charges, who had made them, and how the hearing process worked. Although offered a hearing within 24 hours, the appellant demurred, ostensibly because he did not wish to go forward without first having retained a lawyer. By the time that he procured counsel—late April—DeLucia had told Salem State that she would not testify at a disciplinary hearing. In view of her recalcitrance, Salem State rescinded the temporary suspension and dropped the disciplinary proceedings.

Despite this turn of events, the Melrose school system stood firm in its refusal to allow Hennessy to resume student teaching. On May 15, Salem State sent him a letter advising that he had (a) failed his student teaching practicum due to the premature termination of his placement, and (b) failed to meet four of the common teaching competencies (communication skills, self-evaluation, equity, and professionalism) required for certification by the Massachusetts Department of Education (MDOE). Although the letter invited the appellant to continue in Salem State's noncertification education program, he neither

accepted this invitation nor sought to be heard on the subject of his ouster from the certification program.

The battle then shifted to a judicial forum. Invoking 42 U.S.C. §§ 1983, 1985(3), and 1986, the appellant sued a throng of defendants. For ease in reference, we divide them into moieties: DeLucia and the City of Melrose (collectively, the Melrose defendants) on one hand, and the Commonwealth and numerous Salem State hierarchs (collectively, the Salem State defendants) on the other. He alleged myriad violations of his rights to free speech, free exercise, equal protection, and due process. Following some preliminary skirmishing, not relevant here, the district court granted the defendants' motions for summary judgment. This appeal ensued.

## II. ANALYSIS

■ Summary judgment is appropriate where "[t]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Appellate review of summary judgment orders is de novo. *See Cadle Co. v. Hayes,* 116 F.3d 957, 960 (1st Cir.1997); *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 48 (1st Cir.1990). The particulars attendant to such review are familiar, *see, e.g., Coyne,* 53 F.3d at 457 (listing applicable principles and citing representative cases), and it would be pleonastic to rehearse them here.

■ In mounting his appellate arguments, Hennessy opts for quantity over quality. We have sifted through his asseverational array and conclude that most of his claims do not require comment because they are patently frivolous, entirely lacking in record support, or both. For example, it is transparently clear that the appellant has no equal protection claim against anyone; he has not brought himself within any protected class and he has failed to show that others, similarly situated, were treated differently. *See Alexis v. McDonald's Restaurants of Massachusetts, Inc.,* 67 F.3d 341, 354 & n. 13 (1st Cir. 1995). By like token, he has failed to identify a relevant custom or policy of the City of Melrose, thus negating any claim of municipal liability. *See Polk County v. Dodson,* 454 U.S. 312, 326, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981). He has made no showing that the defendants' conduct originated in an invidiously discriminatory class-based animus, and, thus, his conspiracy claim under 42 U.S.C. § 1985(3) founders. *See Aulson v. Blanchard,* 83 F.3d 1, 3 (1st Cir.1996). This same circumstance dooms his section 1986 claim. *See Creative Environments, Inc. v. Estabrook,* 680 F.2d 822, 834–35 (1st Cir.1982). We therefore restrict our discussion to the appellant's two most promising assertions, namely, (1) that the Melrose defendants violated his First Amendment rights, and (2) that the Salem State defendants abridged his Fourteenth Amendment right to procedural due process.

### A. *The First Amendment Claim.*[1]

■ In order to put this claim into perspective, we first must intuit the nature

---

1. We deal under this heading solely with the appellant's "free speech" rights. Although he places great weight on the source of his perspective—his strong religious beliefs—and struggles mightily to persuade us that a First Amendment "free exercise" claim lurks in the penumbra of his complaint, we remain unconvinced. An individual's religious beliefs do not "excuse him from compliance with an otherwise valid law prohibiting conduct that the State is free to regulate." *Employment Div., Dep't of Human Resources v. Smith,* 494

U.S. 872, 879, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The public school curriculum has been legislatively mandated, *see, e.g.,* Mass. Gen. Laws ch. 69, § 1E (1993), and lies well within the province of state regulation. Thus, to whatever extent the appellant's actions were dictated by his religious beliefs, those beliefs do not excuse him as an apprentice teacher in the public school system from complying with the legislative mandate and implementing the designated curriculum.

of the relevant relationship. The appellant argues ferociously that he should be treated as a student vis-à-vis the Melrose defendants. We do not agree. Although the appellant's placement at Horace Mann related to his role as a Salem State undergraduate, he was not at Horace Mann to take the courses offered there, and, thus, was not in any meaningful sense a pupil of Horace Mann. Rather, his position more nearly approximated that of an apprentice, that is, Horace Mann relied on him in essentially the same way that it would rely on any teacher-in-training or teacher's aide. He was there to master the rudiments of a profession and, in return, he was expected to work with the primary teacher and other school personnel to implement the designated curriculum and to participate in class activities. Though unpaid, this apprentice-type relationship more closely resembles an employer-employee relationship than a school-pupil relationship. We conclude, therefore, that the employer-employee model furnishes the best analogy here and that the case law dealing with the First Amendment in the government employment context, rather than the public school student context, provides the appropriate framework for our inquiry. *See Andersen v. McCotter*, 100 F.3d 723, 726 (10th Cir.1996) (holding that a student intern, working for college credit in a penitentiary, was properly treated as a public employee rather than as a student in a suit against the Department of Corrections alleging First Amendment violations).

■■■■■ The appellant's student teaching position plainly was at will, rendering it susceptible to termination at the school's discretion. *See Bishop v. Wood*, 426 U.S. 341, 347, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). Even an at-will employee, however, may not be dismissed for exercising rights protected under the First Amendment. *See Mount Healthy City School Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 283–84, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). A plaintiff who claims to have been discharged in violation of this rule bears an initial burden of showing that he had engaged in constitutionally protected speech or conduct and that such activity was a substantial or motivating factor underlying his discharge. *See id.* at 287, 97 S.Ct. 568. If the plaintiff succeeds in shouldering that burden, liability will attach unless the defendant can demonstrate by a fair preponderance of the evidence that the ouster would have occurred even without the protected activity. *See id.*

The district court followed this basic approach. It assumed that the First Amendment safeguarded some of the activities described by DeLucia in her communique to Salem State but ruled that the record compelled the conclusion that the appellant's job performance, rather than his protected speech, prompted the Melrose defendants' decision. Although we arrive at the same destination, we pursue a somewhat different analytical path. *See Garside*, 895 F.2d at 48–49 (explaining that "in appraising summary judgments ... a court of appeals is not wedded to the district court's reasoning").

■■■■ The district judge, in passing upon the sufficiency of the Melrose defendants' proof that the protected activity was not a substantial or motivating factor in the decision to dismiss the appellant, drew a distinction between constitutionally protected expression and the job-related effects of that expression. The Supreme Court, however, has shown a preference for a different analytic methodology—one which incorporates consideration of the job-related effects of expression into the logically antecedent question of whether the expression was protected in the first place. *See, e.g., Waters v. Churchill*, 511 U.S. 661, 680, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994); *Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987); *Connick v. Myers*, 461 U.S. 138, 150–52, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983); *Givhan v. Western Line Consol. School Dist.*, 439 U.S. 410, 415 n. 4, 99 S.Ct. 693, 58 L.Ed.2d 619 (1979); *Picker-*

*ing v. Board of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). We emulate the Court's example and examine at the outset whether any of the bases for the appellant's dismissal involved protected speech or expressive conduct. Answering this question requires us to strike "a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731; *see also Waters*, 511 U.S. at 675, 114 S.Ct. 1878 (discussing the heightened interest of the government *qua* employer "in achieving its goals as effectively and efficiently as possible").

■ We start with whether the expressive conduct that formed the basis of De-Lucia's decision to banish the appellant related to matters of public concern. *See Connick*, 461 U.S. at 146, 103 S.Ct. 1684. If so, we then must weigh the appellant's interest, as a citizen, in expressing himself on these matters against Melrose's interest, as an employer, in delivering efficient services. *See id.* at 150, 103 S.Ct. 1684; *see also Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. Although this tamisage at first blush may appear to be a task for the factfinder, the process ultimately embodies a legal determination appropriately made by the court in circumstances in which no genuine dispute exists as to the substance of what the employee said and did. *See, e.g., Horstkoetter v. Department of Pub. Safety*, 159 F.3d 1265, 1270–71 (10th Cir. 1998); *Brasslett v. Cota*, 761 F.2d 827, 829 (1st Cir.1985). This is such a case.

■ DeLucia cited four grounds for termination of the practicum. One was Everson's report that the appellant's behavior during a discussion about abortion had frightened her. The anti-abortion sentiment expressed by the appellant during that tête-à-tête clearly related to a subject of political controversy (and, hence,

public concern). *See Rankin*, 483 U.S. at 386–87, 107 S.Ct. 2891.

■ DeLucia also cited the Family Fiesta Night and Regarding Art incidents. The appellant maintains that his expressive conduct in both instances related, at least in some degree, to his views on the public school curriculum. This is a considerable stretch: it is almost certain that the appellant's conduct and comments at those events were understood by his colleagues and others to address his own personal beliefs rather than the content of the curriculum. Perhaps the most that can be said for the appellant's position is that his refusal to participate in Family Fiesta Night and his departure from (and contemporaneous remarks about) the Regarding Art presentation constituted a veiled, indirect expression of his disdain for the curriculum. But that would not be enough: "the First Amendment protects only speech itself and other expressive conduct that is 'intend[ed] to convey a particularized message' under circumstances in which 'the likelihood [i]s great that the message would be understood by those'" to whom it was addressed. *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 22 (1st Cir.1999) (quoting *Spence v. Washington*, 418 U.S. 405, 410–11, 94 S.Ct. 2727, 41 L.Ed.2d 842 (1974) (per curiam)). Still, the district court determined this case on summary judgment and, under that appellant-friendly standard, we are reluctant wholly to discount Hennessy's suggestions that he intended to express principled disapproval of the curriculum through his hegiras and that those in attendance could reasonably be expected to discern the message.

The curriculum connection is more apparent in respect to the fourth incident—the appellant's confrontation with DeLucia. We glean from his concluding remarks condemning the curriculum that at least some of what transpired during that session constituted a comprehensible expression of his views on a matter of public concern.

■ Given this mixed bag—some clearly protected expression, some less obviously so—we assume, favorably to the appellant, that there is enough here to require a balancing of interests. From that point forward, the test is dynamic: "the State's burden in justifying a particular discharge varies depending upon the nature of the employee's expression." *Connick*, 461 U.S. at 150, 103 S.Ct. 1684. As Justice Marshall phrased it, the expression should "not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." *Rankin*, 483 U.S. at 388, 107 S.Ct. 2891. Also germane are considerations such as "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships ... or impedes the performance of the speaker's duties." *Id.*

■ Against this backdrop, we have little difficulty concluding that the school's strong interest in preserving a collegial atmosphere, harmonious relations among teachers, and respect for the curriculum while in the classroom outweighed the appellant's interest in proselytizing for his chosen cause. We explain briefly.

DeLucia received a report from Everson that the appellant's demeanor while haranguing against abortion had frightened her. The appellant admits what was said but disputes Everson's characterization of the *nature* of that conversation, contending that it was amiable. But the school was entitled, within reasonable limits, to take Everson's report at face value and give weight to her subjective reaction. *See Waters*, 511 U.S. at 676, 114 S.Ct. 1878 (stating that, of necessity, public employers "often do rely on hearsay, on past similar conduct, [and] on their personal knowledge of people's credibility," and that such reliance, if reasonable, does not contravene the First Amendment). When a

school principal receives a report from an experienced teacher who has no apparent axe to grind, we think that the principal can credit the report (at least in the absence of any contrary indication). In all events, the principal here assigned substantial import to Everson's account only after additional problems involving the appellant surfaced. This was both prudent and constitutionally appropriate; a public employer has no obligation to evaluate occurrences in isolation. *See Rankin*, 483 U.S. at 388, 107 S.Ct. 2891.

■ Interaction between grade school teachers in neighboring classrooms, especially those who share instructional responsibilities, is an important consideration for school administrators.[2] In such circumstances, the First Amendment does not require a public employer to stand idly by when one employee's expression engenders fear in a co-worker. *See Waters*, 511 U.S. at 680, 114 S.Ct. 1878 (admonishing that the First Amendment balance must take into account the employer's strong interest in avoiding friction in the work place); *Givhan*, 439 U.S. at 415 n. 4, 99 S.Ct. 693 (similar). We therefore conclude, as a matter of law, that the appellant's statements to Everson, while touching on matters of public concern, did not outweigh the school's considerable interest as an employer in guarding against the impairment of relations among teachers. *See Connick*, 461 U.S. at 151–52, 103 S.Ct. 1684 ("When close working relationships are essential to fulfilling public responsibilities, a wide degree of deference to the employer's judgment is appropriate.").

■ We next consider the Family Fiesta Night and Regarding Art incidents. Giving the appellant the benefit of the doubt, *see supra*, we treat his conduct and expressions of opprobrium as involving matters of public concern (i.e., an intent to comment on the public school curriculum).

---

**2.** On the very day that DeLucia dismissed the appellant, he taught science to both his and Everson's classes.

Even so, Melrose's robust interest in implementing the curriculum without undue interference easily outweighs the appellant's interest in expressing himself at the time and in the manner that he chose. Where, as here, an apprentice teacher elects a mode of communication—audible denigration and visible petulance in the learning environment, in front of students and others—that plainly conflicts with the school's legitimate interest in requiring full participation in the designated curriculum, the constitutional balance tips sharply in the employer's favor. *Cf. Hochstadt v. Worcester Foundation for Experimental Biology*, 545 F.2d 222, 233 (1st Cir.1976) (holding that disruptive employee "went beyond the scope of protected opposition" in light of employer's interest in "maintaining a harmonious and congenial working environment").

Much the same is true in respect to the appellant's comments about the art presentation and his abrupt departure from that activity. Within the hearing of both parents and pupils, the appellant called the exhibition "disgusting" and the Cesaro painting "obscene" before leaving in the middle of class. By choosing these means of expression, the appellant undermined the presentation and neglected his own responsibilities as an apprentice teacher. He capped this neglect by failing to return in time to conduct a previously scheduled class. Any protectable interest that he may have had in expressing his displeasure with the school's curriculum did not match Melrose's interest in preventing interference with its educational mission. *See Rankin*, 483 U.S. at 388, 107 S.Ct. 2891; *Connick*, 461 U.S. at 152, 103 S.Ct. 1684.

■■■ The appellant's comments to the principal fare no better. By the appellant's own account, DeLucia attempted to persuade him that his behavior in connection with Family Fiesta Night and Regarding Art was unprofessional. The appellant rejected this characterization, challenged the propriety of permitting such activities to occur in the public schools, and remained adamant about the moral correctness of his position.

■■■ The First Amendment notwithstanding, a supervisor is entitled to a modicum of respect and decorum in work-related situations. Here, although the appellant's remarks related in part to the curriculum (a matter of admitted public concern), they simultaneously evinced a level of intransigence and insubordination that no employer should be compelled to tolerate. *See Connick*, 461 U.S. at 154, 103 S.Ct. 1684. Moreover, the appellant exacerbated the situation by challenging DeLucia's authority over him and, by extension, her authority over the curriculum. Nothing about the appellant's limited First Amendment interest required the principal to condone actions that she reasonably thought would subvert her hegemony and injure her ability to supervise personnel in the workplace.

The successful operation of an elementary school requires the person in charge to be in charge and to maintain close working relationships with each of her teachers. *Cf. Connick*, 461 U.S. at 151, 103 S.Ct. 1684. Part and parcel of that relationship is the principal's responsibility to oversee teachers' in-class conduct. When a teacher rejects constructive criticism, vilifies the principal, and openly challenges her power to set ground rules for professional conduct, that teacher jeopardizes the successful and efficient operation of the institution. *See Givhan*, 439 U.S. at 415 n. 4, 99 S.Ct. 693. The Melrose defendants' strong interest in avoiding this potentiality overbalanced any interest that the appellant may have had in conveying his thoughts on the public school curriculum at that time and in that manner. *See Connick*, 461 U.S. at 152, 103 S.Ct. 1684.

The appellant has a fallback position. He says that, at a bare minimum, certain facts were controverted and that the existence of these disputes precluded summary judgment. We have canvassed the

record carefully and have confirmed that factual disputes do exist (e.g., the appellant claims that when he stormed out of the Regarding Art activity, he repaired to the school's computer room to work on a tutorial assignment, whereas the defendants claim that he left the premises; the appellant also denies that he called DeLucia "the devil" to her face, whereas she insists that he did). The flaw in the appellant's position, however, is that factual disputes, in and of themselves, do not forestall summary judgment; to accomplish that end, the disputes must involve *material* facts. *See Nereida–Gonzalez v. Tirado–Delgado*, 990 F.2d 701, 703 (1st Cir. 1993); *Medina–Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990). Here, the material facts—what the appellant said and did during the Everson, Family Fiesta Night, and Regarding Art incidents, and what he said when DeLucia called him onto the carpet—are mostly admitted (although the appellant strains to put a more favorable spin on them), and the few details that are controverted do not alter the decisional calculus. The First Amendment issue was, therefore, ripe for *brevis* disposition.

■ We close this portion of our opinion by repeating what Justice Powell wrote a quarter-century ago: "The Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch." *Arnett v. Kennedy*, 416 U.S. 134, 168, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974) (Powell, J., concurring). This tenet remains valid, and this case—in which the Melrose defendants' stated concern over the serial incidents involving the appellant had nothing to do with the content of the appellant's statements, and everything to do with the time, place, and manner in which he communicated his sentiments—comes within its heartland. Hence, the lower court did not err in granting summary judgment on the First Amendment claim.

### B. *The Due Process Claim.*

■ The appellant claims that Salem State failed to accord him both procedural and substantive due process when it removed him from the teacher certification program. "The requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." *Board of Regents v. Roth*, 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). In an effort to satisfy this criterion, the appellant classifies Salem State's denial of an opportunity to obtain certification through its program as a deprivation of a constitutionally protected property interest, presumably one deriving from an implied contractual right to continue in that program.

■ The theoretical underpinnings of this gambit are shaky. The Supreme Court has not yet decided whether a student at a state university has a constitutionally protected property interest in continued enrollment. *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 223, 106 S.Ct. 507, 88 L.Ed.2d 523 (1985) (assuming the existence of such an interest, but leaving the question open); *Board of Curators v. Horowitz*, 435 U.S. 78, 84–85, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978) (same). In any case, the claim to such a property interest is dubious, *see Ewing*, 474 U.S. at 229, 106 S.Ct. 507 (Powell, J., concurring),[3] and in

---

3. To be sure, this court has stated that a college "student's interest in pursuing an education is included within the fourteenth amendment's protection of liberty and property." *Gorman v. University of R.I.*, 837 F.2d 7, 12 (1st Cir.1988). We did not mean to suggest, however, that due process is implicated each time a student at a public school receives a failing grade or is denied admission to a limited-enrollment class. Rather, this general statement must be read in context. Gorman challenged his *disciplinary* suspension from a state university, *see id.* at 11–12, not his removal from a particular program for academic failings, and in the very next sentence of the opinion, the panel limited the

this case it seems especially tenuous because Salem State did not expel the appellant, but merely precluded him from continuing in a particular program. In an abundance of caution, however, we assume for argument's sake that the appellant possessed a constitutionally protected property interest in completing the teacher certification program.

■ On this assumption, we turn next to the question of what process is due. Although that determination is context contingent, there are some overall benchmarks. A hearing—or the offer of one—usually is necessary when a school takes serious *disciplinary* action against a student. *See Goss v. Lopez*, 419 U.S. 565, 579, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). By contrast, academic sanctions customarily are left to academic channels and do not require a hearing as a matter of constitutional right. *See Horowitz*, 435 U.S. at 90, 98 S.Ct. 948; *see generally Dixon v. Alabama State Bd. of Educ.*, 294 F.2d 150, 158–59 (5th Cir.1961) (contrasting dismissal for misconduct, which requires a hearing, with academic dismissal, which does not). The threshold step, then, is to classify Salem State's action as "disciplinary" or "academic."

■ When Salem State removed the appellant from the certification program, it advanced two reasons: (1) he received a failing grade in his practicum, and (2) he had not satisfied four of the common teaching competencies required for certification by the MDOE. On the surface, these reasons seem quintessentially scholastic, but the appellant complains that they were merely a pretext for disciplinary action. He relies principally on two props to support this allegation.

First, the appellant calls our attention to the excellent grades he had received in his course work up until the second semester of his senior year. Proficiency in course work, however, is only one component of

the certification process. The practicum constitutes a completely separate component. Thus, the fact that the appellant had good grades is only marginally relevant. *Cf. Horowitz*, 435 U.S. at 95, 98 S.Ct. 948 (Powell, J., concurring) (noting that the plaintiff was dismissed from medical school "because she was as deficient in her clinical work as she was proficient in the 'book-learning' portion of the curriculum").

To be sure, the appellant received some positive reviews from Dr. Mangini during the early stages of his practicum. That datum, however, fails to negate the inescapable fact that DeLucia eventually dismissed him from the practicum, the successful completion of which was a prerequisite to certification. Given that dismissal, it is surpassingly difficult to see how Salem State, from a purely academic standpoint, could have recommended the appellant for certification. And because the approved methodology for assessing the teaching competencies, set by the MDOE, explicitly requires the certifying institution to evaluate a fledgling teacher's interpersonal skills, the appellant's inability to communicate effectively with his colleagues at Horace Mann and his unwillingness to work within the prescribed curriculum reasonably could have as much influence on Salem State *from an academic standpoint* as, say, his ability to prepare a lesson plan. *Cf. id.* at 91 n. 6, 98 S.Ct. 948 (concluding that factors such as "[p]ersonal hygiene and timeliness may be as important … in a school's determination of whether a student will make a good medical doctor as the student's ability to take a case history or diagnose an illness").

Nor does the virtual certainty that the Salem State faculty considered the appellant's problems at Horace Mann when adjudging his performance "incomplete" and assigning him failing grades in various teacher competencies transform its aca-

---

import of the quoted passage to cases in which students faced "expulsion or suspen-

sion from a public educational institution" on disciplinary grounds. *Id.* at 12.

demic decision into a disciplinary one. In this regard, the appellant complains that the reasons DeLucia gave for terminating the practicum involved his *conduct,* not his *competence,* and thus were disciplinary in nature. This complaint is groundless. The appellant's conduct at Horace Mann had academic significance because it spoke volumes about his capacity to function professionally in a public school setting. Bearing this in mind, we find no *factual* information of a significantly probative nature that suggests that Salem State's decision to fail the appellant rested on anything other than the faculty's academic judgment that he had neither completed the required assignments nor demonstrated the practical qualities necessary to perform efficaciously as a public school teacher. Although this judgment by its nature had a subjective cast, it nonetheless fell well within the sphere of constitutionally permissible academic decisionmaking. *See id.* at 90, 98 S.Ct. 948.

█ The appellant's second basis for contending that Salem State's decision was pretextual springs from the chronology of events. He argues that Salem State initially suspended him for misconduct and only asserted academic grounds for denying him certification after circumstances stymied its pursuit of disciplinary charges. The appellant correctly recites the timing of these two events, but "one plus one does not equal three," and a causal connection is not necessarily established by a temporal link. *Blackie v. Maine,* 75 F.3d 716, 723 (1st Cir.1996). Here, the temporal sequence simply will not bear the weight that the appellant piles upon it.

█ The mere fact that the appellant's conduct carried both disciplinary and academic implications does not, without more, transform the character of Salem State's action or support the inference that the college used its academic decisionmaking power as a back door to achieve disciplinary goals.[4] The appellant's argument in opposition conveniently overlooks Salem State's documented concerns, predating his placement at Horace Mann, about his ability to function in a public school setting. The argument also overlooks the undeniable fact that Salem State at some point had to make an academic judgment with respect to his practice teaching and the required competencies. The appellant's bald allegation does not suffice to create a genuine issue of material fact as to whether Salem State resolved these points adversely to the appellant simply as a means of imposing a disciplinary or quasi-disciplinary sanction. *See, e.g., Cadle,* 116 F.3d at 960 (explaining that "establishing a genuine issue of material fact requires more than effusive rhetoric and optimistic surmise"); *Medina–Munoz,* 896 F.2d at 8 (holding that one opposing summary judgment cannot rely simply on "conclusory allegations" or "unsupported speculation"); *see also Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir. 1989) (holding that pretextual reason for firing employee is not established by mere allegation).

█ That ends the matter. Because the appellant has not placed in legitimate doubt the *academic* nature of Salem State's decision to remove him from the teacher certification program, his claim that some more elaborate process should have been accorded *as a matter of constitutional right* before reaching that decision fails. The purpose behind the constitutional requirement that a student should be offered the opportunity to be heard in regard to disciplinary determinations lies in the resemblance that such determinations bear to "traditional judicial and ad-

---

4. We do not mean to suggest that timing can never be significantly probative. Colleges and universities often require that students be "in good standing" for the successful completion of academic programs. Good standing, in turn, may be premised on the absence of certain types of disciplinary problems. In such instances, educational institutions cannot avoid the constitutional protections that attend disciplinary proceedings simply by recharacterizing disciplinary issues in terms of academic standing.

ministrative factfinding." *Horowitz,* 435 U.S. at 88–89, 98 S.Ct. 948. Because those considerations do not obtain in respect to academic determinations, the Constitution typically does not require a hearing in connection with the imposition of academic sanctions. *See id.* at 90, 98 S.Ct. 948 (declining "to ignore the historic judgment of educators and thereby formalize the academic dismissal process by requiring a hearing"); *Wheeler v. Miller,* 168 F.3d 241, 248 (5th Cir.1999) (holding that due process did not require a hearing for academically-based dismissal of student); *Clements v. County of Nassau,* 835 F.2d 1000, 1006 (2d Cir.1987) (similar); *Mauriello v. University of Medicine & Dentistry,* 781 F.2d 46, 49 (3d Cir.1986) (similar); *Ikpeazu v. University of Neb.,* 775 F.2d 250, 254 (8th Cir.1985) (similar); *cf. Disesa v. St. Louis Community College,* 79 F.3d 92, 95 (8th Cir.1996) (stating that lower court exceeded due process requirements by requiring a hearing prior to academic dismissal). Indeed, judicial intrusion of this kind into the academic community could do irreparable harm to the traditional faculty-student relationship. *See Horowitz,* 435 U.S. at 90, 98 S.Ct. 948; *see also Epperson v. Arkansas,* 393 U.S. 97, 104, 89 S.Ct. 266, 21 L.Ed.2d 228 (1968) (cautioning against unwarranted "[j]udicial interposition in the operation of the public school system"). We hold, therefore, that the appellant was not constitutionally entitled to a hearing regarding his removal, for academic reasons, from the teacher certification program.[5]

█ We touch one related base. To the extent that the appellant seeks to assert a substantive due process claim, he has adduced no evidence from which we could infer that Salem State's decision was

"beyond the pale of reasoned academic decisionmaking." *Ewing,* 474 U.S. at 227–28, 106 S.Ct. 507. Although Salem State could have opted for a different course (e.g., it might have tried to transfer Hennessy to another elementary school to finish his practicum), the course it chose was a reasonable solution to a vexing set of circumstances. In the usual case, courts should leave such judgment calls to the academicians—and this case falls comfortably within the mine-run. *See, e.g., Wheeler,* 168 F.3d at 248; *Disesa,* 79 F.3d at 95; *Clements,* 835 F.2d at 1006; *Mauriello,* 781 F.2d at 49; *Ikpeazu,* 775 F.2d at 254.

### III. CONCLUSION

█ We need go no further.[6] Because the district court appropriately granted the defendants' motions for summary judgment, its order will be

*Affirmed.*

---

5. This is not to say that a hearing of some sort might not have provided Salem State with a slightly different gloss on what exactly had transpired at Horace Mann. Our concern, however, is with constitutional imperatives, not with best practices.

6. The district court did not err in denying the appellant's motion for leave to file an amend-

ed complaint, as the appellant gave the court no reason to believe that amendment somehow would boost him across the summary judgment hurdle. *See Correa–Martinez v. Arrillaga–Belendez,* 903 F.2d 49, 59 (1st Cir. 1990) (holding that futile amendments need not be allowed).