STATE OF MAINE  
CUMBERLAND, ss.

BUSINESS & CONSUMER COURT  
LOCATION: PORTLAND  
DOCKET NO. BCDWB-CV-2019-52

DEBORAH FURLONG and DENISE )  
BENTON (individually and on behalf of F.R. )  
Carroll, Inc.), )  
)  
          Plaintiffs, )  
      v. )  
)  
FRANCIS CARROLL II, MICHAEL )  
CARROLL, and KATHLEEN COLBY )  
)  
          Defendants. )

**ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Before the Court is Defendants' Francis Carroll II, Michael Carroll and Kathleen Colby's Motion for Summary Judgment pursuant to M. R. Civ. P. 56. In their Motion, Defendants assert that Plaintiffs Deborah Furlong and Denise Benton fail to establish a prima facie case, grounded in admissible evidence, in support of each element of their claims.

Plaintiffs have conceded that discovery has adduced insufficient evidence to continue with Counts IV through VII of their Complaint and therefore consent to their dismissal. Additionally, Plaintiffs acknowledge that Count II, alleging undue influence, is subsumed by Count I, and exists as an element of tortious interference with an expectancy of inheritance. Plaintiffs maintain that they have alleged sufficient facts to demonstrate that Defendants used isolation, coercion, and alienation to exert undue influence over the parties' mother, and therefore oppose Defendants motion on Count I. Plaintiffs also oppose Defendants' Motion with regard to their claim for unjust enrichment in Count III. Because the Court finds Plaintiffs have failed to establish a prima facie case for their claims, it grants Defendant's Motion in its entirety.

1

Plaintiffs are represented by Attorneys Neal Pratt, T. Griffin Leschefske, and Cameron Goodwin. Defendants are represented by Attorney Thomas Hallett.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if, based on the parties' statements of material fact and the cited record, there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. M.R. Civ. P. 56(c); *Levine v. R.B.K. Caly Corp.,* 2001 ME 77, ¶ 4, 770 A.2d 653. To survive a moving party's motion for summary judgment, the non-moving party must establish a prima facie case for each of their claims and set forth specific facts showing there is a genuine issue of material fact. *Key Trust Co. of Maine v. Nasson College,* 1997 ME 145, ¶ 10, 697 A.2d 408; *see also* M.R. Civ. P. 56(e). A fact is material if it has the potential to affect the outcome of the suit. *Id*. To be considered "genuine", there must be sufficient evidence offered to raise a factual contest requiring a fact finder to choose between competing versions of the truth. *Rainey v. Langden,* 2010 ME 56, ¶ 23, 998 A.2d 342; *Burdzel v. Sobus,* 2000 ME 84, ¶ 6, 750 A.2d 573. Facts established in the record are viewed in the light most favorable to the non-moving party. *See Davis v. Dionne,* 2011 ME 90, ¶ 2, 26 A.3d 801. However, this showing "requires more than effusive rhetoric and optimistic surmise." *Hennessy v. City of Melrose,* 194 F.3d 237, 251 (1st Cir. 1999). The Court must ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Carroll v. Xerox Corp.,* 294 F.3d 231, 237 (1st Cir. 2002).

## FACTS

### I. Background and Relationship Between Barbara and her Children

The Plaintiffs and Defendants in this action are all siblings and sons and daughters of Barbara ("Barbara" and Frank Carroll ("Francis"). In total, Barbara and Francis raised six children, four girls and two boys. In addition to raising their children, Barbara and Francis also

created a paving and concrete business, F.R. Carroll, Inc. Four of the children went into the family business to some degree, with Michael, Frank Carroll II, and Kathleen Colby ("Kathy") remaining with the business until an asset sale in February 2019. (Pl.'s Add. S.M.F. ¶ 64.) Denise Benton had also worked for the family business until 2002. The other daughters Deborah Furlong and Donna Welch never did significant work for the business. (Def.'s S.M.F. ¶¶ 28,

Francis and Barbara executed wills on July 21, 2016. (Pl.'s Add. S.M.F. ¶ 1.) Francis died of lung cancer shortly thereafter on August 3, 2016. Because her husband did not survive her, Barbara's 2016 Will left her stock ownership in F.R. Carroll to Frank, Kathy, and Michael who all still worked at the company, $100,000 cash bequests to Deborah, Donna, and Kathy and the residue and remainder of her estate to all six children. (Pl.'s Add. S.M.F. ¶ 1.) Francis and Barbara also gifted real estate to Deborah, Michael, Kathy, and Donna's children, but not to Frank or Denise's children.

In 1984, Deborah moved to California, but maintained contact with her parents. (Pl.'s Add. S.M.F. ¶ 2.) In 1993 and again in 2001, Deborah took month-long unpaid leaves of absence from work to care for her mother, who had been diagnosed with breast cancer. (Pl.'s Add. S.M.F. ¶¶ 4-5.) Deborah then returned to Maine permanently in 2016 to be near and help take care of her parents when her father was diagnosed with lung cancer. (Pl.'s Add. S.M.F. ¶ 6.) Following Deborah's father's death in 2016, she began spending significant time with her mother, including taking her shopping, and to Mass and breakfast on Sundays. (Pl.'s Add. S.M.F. ¶¶ 7-9.) In September 2017 Deborah got a job closer to home to visit and help her mother more regularly. (Pl.'s Add. S.M.F. ¶ 11.) Barbara told Deborah how glad she was that she was home, how much she valued their time together, and that she wanted Deborah to have her engagement and wedding band when she passed away. (Pl.'s S.M.F. ¶ 13.)

3

Like Deborah, Denise alleges that she had an excellent relationship with her mother. Denise lived in Limerick Maine and, along with her husband, purchased the Limerick Mobile Home Park from her parents in December of 1999 for $100,000 plus interest. (Def.'s S.M.F. ¶ 22.) Working at the mobile home park became Denise's full-time job after leaving the family business in the early 2000's. (Def.'s S.M.F. ¶ 23.) The mobile home park took several years to turn a profit but now earns approximately $50,000 per year. (Pl.'s Add. S.M.F. ¶ 16.)

During the last few years of Barbara's life, she suffered from a variety of health conditions and was hospitalized at least once per year during the period from 2017 to 2019. (Pl.'s Add. S.M.F. ¶ 17.) During that period, Denise was asked to take Barbara to thirty (30) doctor and hospital appointments beginning on February 17, 2017 and ending on May 21, 2018 when her mother stopped asking her. (Pl.'s S.M.F. ¶¶ 14-15.) Denise alleges that in mid-May 2018 she asked Kathy to take their mother to an appointment because she was unable, and that Barbara never asked Denise to bring her to appointments thereafter. (Pl.'s Add. S.M.F. ¶ 15.)

Eventually, Barbara executed a new will (the "2018 Will") on December 7, 2018. (Def.'s S.M.F. ¶ 15.) The 2018 Will revoked and replaced the 2016 Will. (Def.'s S.M.F. ¶¶ 7, 15.) The 2018 Will left, in pertinent part, cash bequests of $100,000 to each of her daughters, Deborah, Donna, and Kathy, and sons Michael and Frank, before directing that the residue be divided between only Frank, Kathy, and Michael. (Def.'s S.M.F. ¶ 15.) Apart from directing a share of tangible personal property to Denise and leaving a $20,000 cash gift to each of Denise's three children, the 2018 Will otherwise makes no provision for Denise. (Def.'s S.M.F. ¶ 15.) Therefore, the material differences between the dispositive provisions of the 2016 and 2018 wills are (1) The addition of Michael and Frank as recipients of cash gifts of $100,000, and (2)

4

exclusion of Deborah, Donna, and Denise from a share of residue. Barbara died on March 8, 2019 at the age of 84. (Def.'s S.M.F. ¶ 21.)

## II.     Facts Relating to Deborah and Denise's Allegation of Undue Influence

Plaintiffs allege certain facts for the purpose of establishing a prima facie case of tortious interference with an expectancy of an inheritance. In accordance with the legal standard for evaluating a motion for summary judgment[1], the Court views the following facts in the light most favorable to Plaintiffs, the non-moving party:

In December 2017, Michael, at a friend's request, went to Barbara's house to have her execute a corrective right of way deed ("ROW deed") which had been prepared by the friend's attorney, regarding property Barbara and Francis had sold to the friend years earlier. (Pl.'s Add. S.M.F. ¶ 22.) Barbara signed the ROW deed after Michael instructed her to. *Id*. The ROW was to run along Deborah's property. *Id.* Later, on December 4, 2017, Barbara called Deborah and told her that Michael had her sign a document, that she did not understand it, but that it was bad for Deborah and she felt taken advantage of. (Pl.'s S.M.F. ¶ 25.)

On May 1, 2018 Barbara asked Deborah to take her to her attorney to deal with the ROW issue. There, a paralegal told Barbara the ROW deed was not effective. (Pl.'s S.M.F. ¶ 29.) Barbara then contacted her new estate attorney Dennis O'Donovan[2], who was concerned and advised Barbara to meet with a litigation attorney should they be worried about elder abuse. (Pl.'s S.M.F. ¶ 30.) Barbara scheduled a meeting with a litigation attorney recommended by O'Donovan, but never met with him because Michael was worried about potential repercussions

---

[1] *See Davis,* 2011 ME 90, ¶ 2, 26 A.3d 801.

[2] Barbara's longtime estate attorney Eileen Epstein prepared and notarized the 2016 Will. (Def.'s S.M.F. ¶ 7.) Attorney Epstein retired and at that point Barbara transitioned to Epstein's law partner, Attorney Dennis O'Donovan. (Def.'s S.M.F. ¶ 10.)

for him and a notary. (Pl.'s S.M.F. ¶ 32.) The dispute concerning the ROW deed caused the family to further split into factions, with Michael blaming Deborah for causing problems and Frank disowning both Deborah and Denise. (Pl.'s Add. S.M.F. ¶ 33.) Deborah also asserts that Michael helped Barbara transfer land which she did not own on various occasions. (Pl.'s S.M.F. ¶ 28.)

In May 2018, the same month Deborah had brought Barbara to visit her attorney, Barbara asked Denise to take her to the Rowe Lincoln car dealership to look at an SUV she wanted to purchase. (Pl.'s Add. S.M.F. ¶ 34.) Barbara told Denise later that Frank Refused to let her buy the SUV and instead wanted her to keep her Ford Taurus. *Id.*

Following May 11, 2018, the extended Carroll family cut off contact with Deborah, Denise, and their families, and would avoid them in instances the entire family was together. (Pl.'s Add. S.M.F. ¶ 35.) Barbara stopped asking Denise to take her to appointments and stopped attending church with Deborah or allowing her to visit without another family member present. (Pl.'s Add. S.M.F. ¶¶ 36-38.) Instead, Barbara began relying on other family members including Kathy, Kathy's daughter Kayla, or Frank. (Pl.'s Add. S.M.F. ¶ 36.) Despite traditionally celebrating holidays and occasions together, none of Michael, Kathy, or Frank's family members attended Deborah's surprise 60th birthday party that Denise planned on August 11, 2018; Barbara attended the party only after Deborah's son got upset and drove to pick her up. (Pl.'s Add. S.M.F. ¶¶ 40-41.)

Barbara's 2018 Will came into existence after she met with her estate attorney O'Donovan for the first time. (Pl.'s Add. S.M.F. ¶ 51.) They met for two hours in Limerick on July 31, 2018. *Id.* Barbara then instructed O'Donovan to work with Michael, who gathered information about his mother's real estate holdings for gifting and estate purposes. (Pl.'s Add.

6

S.M.F. ¶ 52.) On September 12, 2018, O'Donovan mailed Barbara a new draft will and a letter explaining the changes that had been made to her preexisting 2016 Will. Barbara went back and forth with O'Donovan's office regarding changes to the will, and on November 5, 2018 O'Donovan mailed a second draft of the will to Barbara along with a letter explaining the final revisions. The 2018 Will was executed on December 7, 2018. (Def.'s S.M.F. ¶ 15.)

By the fall of 2018, Barbara has lost much of her mobility, and was unable to cook for herself. (Pl.'s Add. S.M.F. ¶¶ 44-45.) During this period Michael was at Barbara's house every day he was in town, Frank would visit 4-5 times per week, and Kathy would visit 2-3 times daily. (Pl.'s Add. S.M.F. ¶¶ 42-43.) Barbara's children prepared her meals and would then date them and place them in the refrigerator. (Pl.'s Add. S.M.F. ¶ 45.) Barbara executed Advanced Medical Health Care Directives for Kathy, Michael, and Frank on August 31, 2018 as well as a durable power of attorney for Kathy. (Pl.'s Add. S.M.F. ¶ 46.) That Fall, Denise alleges she contacted Michael and advised him that Barbara's cleaning person had reserved a few days a week to help care for Barbara, but Michael refused the offer and refused to speak as a family about Barbara's care needs. (Pl.'s Add. S.M.F. ¶ 72.)

Barbara's physical health continued to deteriorate into 2019, and she sustained serious falls in both January and February. As a result of the first fall, Barbara suffered spinal fractures and broken ribs. (Pl.'s Add. S.M.F. ¶ 67.) Barbara was hospitalized after the second fall after lying in freezing temperatures until an oil delivery man found her. She died from complications on March 9, 2019. (Pl.'s Add. S.M.F. ¶ 68.)

In addition to Barbara's physical health, Deborah and Denise allege that late in her life their mother was often confused and "foggy." Examples of the confusion include the signing of the ROW deed, mistaking Denise's purchase of the mobile home park for a "gift", and having

trouble bookkeeping and balancing her checking account. (Pl.'s Add. S.M.F. ¶¶ 16, 19-21.) Deborah alleges that in February 2019, while Barbera was in the intensive care unit at Maine Medical Center, Frank acknowledged that Barbera had been suffering from dementia since the fall of 2018. (Pl.'s Add. S.M.F. ¶ 18.)

After Barbara's death, her children met with the funeral director on March 11, 2019.[3] At this meeting Donna suggested her mother's rings be left on her when buried, to which Kathy replied "it is very clear what is to happen with the rings", and Michael contributed, "the rings were to be left to Kayla and Kathy under an Addendum" to the Will. (Pl.'s Add. S.M.F. ¶ 73.) Deborah and Denise assert that this caused them to believe their other siblings had already seen the contents of the Will and Addendum. *Id.* In June 2019, in the cemetery where Barbara was buried, Deborah asked Kathy why only three children had gotten their parent's remaining estate when their mother and father seemingly wanted it to go to all six children. (Pl.'s Add. S.M.F. ¶ 63.) Deborah alleges that Kathy responded to this question, admitting that "it was the boys. The boys did this. It's their doing. I am the same good person that I've always been. It's the boys. It was their idea." *Id.*

**DISCUSSION**

**Count I: Tortious Interference with an Expectancy of an Inheritance**

To survive Defendants' Motion for Summary Judgment, Plaintiffs must establish a prima facie case for each of the following elements of tortious interference with an expectancy of an inheritance:

> (1) the existence of an expectancy of inheritance; (2) an intentional interference by a
> defendant through tortious conduct, such as fraud, duress, or undue influence; (3) a

---

[3] Plaintiffs' Additional Statement of Material Fact says that the family met with the funeral director on March 11, 2018. The Court assumes this statement is mistaken, as Barbara had not yet died on this date, and the family discussed the 2018 Will which was not executed until December 2018, nine months later.

reasonable certainty that the expectancy of inheritance would have been realized but for the defendant's interference; and (4) damage resulting from that interference.

*Cote v. Cote,* 2016 ME 94, ¶ 12, 143 A.3d 117 (citing *Morrill v. Morrill,* 1998 ME 133, ¶ 7, 712 A.2d 1039). As the second element indicates, an intentional interference can be shown through the exercise of undue influence. "Undue influence is defined as unfair persuasion of a party who is under the domination of the person exercising the persuasion or who by virtue of the relation[ship] between them is justified in assuming that that person will not act in a manner inconsistent with his welfare." *Id.* ¶ 14 (quoting *Theriault v. Burnham,* 2010 ME 82, ¶ 6, 2 A.3d 324). A presumption of undue influence arises "if the plaintiff shows by a preponderance of the evidence that a confidential relationship existed between the defendant and the decedent." *Id.* "A confidential relationship is one in which an individual placed trust and confidence in the defendant and there was a great disparity of position and influence in the relationship." *Id.* The existence of a confidential relationship is a question of fact. *Estate of Campbell,* 1997 ME 212, ¶ 6, 704 A.2d 329. When parties are related by blood or marriage, a court may find that a confidential relationship exists where "there is evidence as to trusting and where the blood or family relationship is in a close degree so that the imposition of great trust and the letting down of all guards and bars is natural." *Id.* ¶ 8.

As an initial matter, Plaintiffs satisfy their burden on the first element of their cause of action. Plaintiffs clearly expected to share in the remainder of Barbara's estate as provided for in the 2016 Will. (Pl.'s Add. S.M.F. ¶ 1.) Neither Deborah nor Denise were privy to the contents of the final 2018 Will prior to their mother's death.

Likewise, for the purpose of this Motion the Court presumes there was undue influence because Plaintiffs make a prima facie showing that there was a confidential relationship between Barbara and Michael, Frank, and Kathy. It is undisputed that Barbara executed Advanced

9

Medical Health Care Directives for Kathy, Michael, and Frank on August 31, 2018, as well as durable power of attorney for Kathy. (Pl.'s Add. S.M.F. ¶ 46.) While it is disputed whether Barbara was incapacitated to the extent that she could not cook her own meals, the parties agree that Barbara found it difficult to stand for long periods and that Mike, Frank, and Kathy helped her by bringing her meals. (Pl.'s Add. S.M.F. ¶ 45.) Because Barbara's health was deteriorating and she was often in and out of the hospital for appointments, she relied on family members such as Frank, Kathy, and Kathy's daughter Kayla for transportation. (Pl.'s Add. S.M.F. ¶ 36.) When Denise inquired about Barbara's care needs and mentioned that her housekeeper was willing to help, Michael took responsibility of the situation and declined the offer. (Pl.'s Add. S.M.F. ¶ 72.) When Denise suggested getting the family together to discuss the matter Michael again declined and told her "no one would show up." *Id.* In certain situations Barbara's children would advise her not to spend her money. (*See* Pl.'s Add. S.M.F. ¶ 34.) Finally, at the time Barbara began planning for her 2018 Will she instructed Attorney O'Donovan to work alongside Michael who gathered information about his mother's real estate holdings for gifting and estate purposes. (Pl.'s Add. S.M.F. ¶ 52).

The facts above indicate that most Barbara's important decisions and health care needs were managed by Michael, Frank, and Kathy. Likewise, they provided Barbara with most of the support she needed to have meals and make it to appointments with her Doctor. The fact that Michael, Frank, and Kathy were all children of Barbara and lived and worked closely to her for their entire lives only increases the likelihood Barbara trusted them completely and let down her guard. *See Estate of Campbell,* 1997 ME 212, ¶ 8, 704 A.2d 329. Therefore, Plaintiffs have offered sufficient evidence to suggest there was a disparity in position and influence, giving rise to a presumption of a confidential relationship. Because the confidential relationship is

established at this stage, the burden shifts. Once a confidential relationship has been established, the burden shifts to the opposing party to prove that the transfer was "entirely fair and that it was not affected by undue influence." *Cote,* 2016 ME 94, ¶ 17, 143 A.3d 117 (citing *Albert v. Albert,* 2015 ME 5, ¶ 9, 108 A.3d 388).

Despite the Court's finding that Plaintiffs have satisfied their burden on the first two elements of their cause of action, it is not precluded from entering summary judgment in Defendant's favor. Where a defendant moves for summary judgment, the burden is on the plaintiff to adduce prima facie evidence as to *each element* of the claim. *Id.* ¶ 18 (citing *Lougee Conservancy v. CitiMortgage, Inc.,* 2012 ME 103, ¶ 12, 48 A.3d 774). The Court has concluded that Plaintiffs are unable to satisfy the third element of their claim for tortious interference with an expectancy of an inheritance.

The third element of a claim for tortious interference with an expectancy of inheritance only allows recovery:

> . . . for an inheritance or gift that the other would have received but for the tortious interference of the actor. This means that, as in other cases involving recovery for loss of expectancies. . . there must be proof amounting to a reasonable degree of certainty that the bequest or devise would have been in effect at the time of the death of the testator or that the gift would have been made inter vivos if there had been no such interference.

*Id.* ¶ 19 (quoting *Plimpton v. Gerrard,* 668 A.2d 882, 886 (Me. 1995). To reiterate, Plaintiffs satisfy their burden regarding the existence of the expectancy because there is evidence in the record they were listed as beneficiaries of the remainder of their parent's estate in the 2016 Will. However, Plaintiffs have failed to establish any particular actions Michael, Frank, and Kathy took amounting to "but for" causation of Plaintiffs disinheritance.

To establish that Michael, Frank, and Kathy's actions were the "but for" cause of Plaintiffs' disinheritance, the Court would be forced to engage in the kind of improbable

11

inferences, and unsupported speculation prohibited on a motion for summary judgment. *Carroll v. Xerox Corp.,* 294 F.3d 231, 237 (1st Cir. 2002). Plaintiffs allege plenty of facts hinting that Defendants engaged in untoward behavior. For instance, Plaintiffs provide facts of a family dispute which eventually resulted in their mother spending less time with them and asking them for fewer favors. In Plaintiffs view, the fact that their mother did not want them around is evidence of Michael, Frank, and Kathy's manipulation, which they describe as "isolation", and "alienation." However, based on the facts in the record, it is just as likely that it was Barbara's decision not want to spend time with Plaintiffs any longer and made conscious efforts to avoid them on her own behalf. Likewise, Plaintiffs recall when Kathy explained it was "the boys" fault they did not remain beneficiaries of the remainder of their mother's estate. Here, what Plaintiffs lack are any facts describing *why* or *how* "it was the boys' fault."

Finally, Plaintiffs have sought to offer contentions that their mother was "foggy", and that Michael, Frank, and Kathy took advantage of that "fogginess." However, Plaintiffs offer no evidence that the fogginess, paired with Michael, Frank, or Kathy's manipulation, was the but for cause of their disinheritance. The record does not establish that in December 2018 Plaintiffs' mother had deteriorated mentally to the extent she could not engage in estate planning on her own behalf. Instead, the record demonstrates that Barbara met with Attorney O'Donovan alone for two hours, and after that they maintained regular correspondence thereafter until the 2018 Will was executed. For his part, Attorney O'Donovan has not made any statements indicating he believed Barbara was not of sound mind and was under the control of her children at the time the 2018 Will was executed. Thus, no matter the sincerity of Plaintiffs' concern, their allegations are too vague to establish the "but for" causation required to establish a prima facie case of tortious

interference with an expectancy of an inheritance. The Court grants Defendants' motion for summary judgment regarding Count I.

**Count III: Unjust Enrichment**

Count III of Plaintiffs' Complaint alleges unjust enrichment. A claim for unjust enrichment is established with proof that (1) the claimant "conferred a benefit on" the receiving party, (2) the receiving party "had appreciation or knowledge of the benefit," and (3) "acceptance or retention of the benefit was under circumstances that make it inequitable for [the receiving party] to retain the benefit without payment of its value." *Estate of Anderson,* 2010 ME 10, ¶ 10, 988 A.2d 977.

The basis of Plaintiffs' unjust enrichment claim is that they conferred the value of their expectancy upon Defendants. Plaintiffs assert that Defendants were aware of Denise and Deborah's expectancy to inherit, and that Defendants retention of the value of those expectancies would be unjust. As the Court has previously stated, Plaintiffs successfully established their expectancy as beneficiaries of the 2016 Will. However, despite Plaintiffs expectancy, they cannot sustain an unjust enrichment claim against other heirs or beneficiaries of their mother's Will in the absence of a benefit conferred upon such heirs or beneficiaries. Further, Defendants have not unjustly retained a benefit because they accepted the inheritance provided to them in their mother's Will. A holding to the contrary would be contrary to law. Accordingly, the Court grants Defendant's Motion for Summary Judgment on Count III.

**CONCLUSION**

For the foregoing reasons, the Court grants Defendants' Motion for Summary Judgment in its entirety. Plaintiffs fail to establish a prima facie case of tortious interference with an expectancy of an inheritance, as they were unable to demonstrate that Defendants were the "but

for" cause of their disinheritance. Additionally, Plaintiffs fail to satisfy the elements of a claim for unjust enrichment.

The Clerk is requested to enter this Order on the docket for this case by incorporating it by reference. M.R. Civ. P. 79(a).

Dated: 7/19/2021

**M. Michaela Murphy, Justice**
**Business and Consumer Court**