# United States Court of Appeals
## For the First Circuit

---

No. 02-2103

MARTA I. TORRES-ROSADO,

Plaintiff, Appellant,

v.

ÁNGEL E. ROTGER-SABAT; JOSÉ A. FUENTES-AGOSTINI;
ANÍBAL TORRES-RIVERA,

Defendants, Appellees;

JOSÉ R. RAMOS-ROMÁN; ITALA RIVERA-BUONOMO; EDWIN VÁZQUEZ-
BERRIOS; CARLOS D. RIESTRA-CORTÉS,

Defendants.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Jaime Pieras, Jr., Senior U.S. District Judge]

---

Before

Selya, Circuit Judge,
Cyr, Senior Circuit Judge,
and Lynch, Circuit Judge.

---

Manuel R. Suarez Jiménez for appellant.

Leticia Casalduc-Rabell, Assistant Solicitor General,
with whom Roberto Y. Sánchez-Ramos, Solicitor General, and
Vanessa Lugo-Flores, Deputy Solicitor General, were on brief for
appellees.

---

July 2, 2003

---

**LYNCH**, **Circuit Judge**.  This is an appeal from entry of summary judgment against claims by a public employee that her superiors retaliated for her speech on a matter of public concern and terminated her employment without due process.  Plaintiff Marta Torres-Rosado, an agent in the Puerto Rico Justice Department's Special Investigations Bureau (SIB), claims that her superiors fired her because she wrote a confidential internal memorandum suggesting that the SIB's investigation of an important politician might be "paralyzed" as part of a cover-up.  She has since been reinstated, pursuant to a settlement of related litigation in the Puerto Rico courts.

The defendants remaining in the case are Aníbal Torres-Rivera, Ángel Rotger-Sabat, and José Fuentes-Agostini, who were, at the relevant time, Director of the SIB, Assistant Attorney General, and Attorney General, respectively.  In her federal case, brought under 42 U.S.C. §§ 1983, 1985 (2000), plaintiff[1] claims that these defendants denied her procedural due process, violated her First Amendment rights, and engaged in a conspiracy to deprive her of civil rights.  She also advanced pendent claims under Puerto Rico law that are not part of this appeal.

The district court granted summary judgment to defendants on all federal claims and declined jurisdiction over the pendent

---

[1]   To avoid confusion between plaintiff Torres-Rosado and defendant Torres-Rivera, we will refer to the former as "plaintiff."

-2-

claims.  We affirm the dismissal of the due process and civil rights conspiracy claims.  On the First Amendment claim, we find that the district court erred in determining that plaintiff's memo raised no issue of public concern.  Nonetheless, we affirm summary judgment against the First Amendment claim on other grounds.

I.

A.  Scope of Summary Judgment Record

Before turning to the facts of the case, we address a preliminary question of what material should properly be considered in the summary judgment record before us.  The district court deemed defendants' motion for summary judgment, and the factual assertions supporting it, to be unopposed, because plaintiff failed to file timely oppositions to them.  See Torres-Rosado v. Rotger-Sabat, 204 F. Supp. 2d 252, 253 & n.1 (D.P.R. 2002).  Such oppositions are required by the district court's local rules.  See D.P.R. R. 311.5, 311.12.  This court has held repeatedly that the district court in Puerto Rico is justified in holding one party's submitted uncontested facts to be admitted when the other party fails to file oppositions in compliance with local rules.  See, e.g, United Parcel Serv., Inc. v. Flores-Galarza, 318 F.3d 323, 330 & n.10 (1st Cir. 2003); Corrada-Betances v. Sea-Land Serv., Inc., 248 F.3d 40, 43 (1st Cir. 2001); Morales v. A.C. Orssleff's EFTF, 246 F.3d 32, 33-34 (1st Cir. 2001); Ruiz-Rivera v. Riley, 209 F.3d 24, 27-28 (1st Cir. 2000).  This, of course, does not mean the

unopposed party wins on summary judgment; that party's uncontested facts and other evidentiary facts of record must still show that the party is entitled to summary judgment.

Defendants moved for summary judgment on April 15, 2002, and included with their motion a statement of uncontested facts. Plaintiff's response was due ten days later. See D.P.R. R. 311.5. This deadline came and went, and only on April 29 did plaintiff submit a motion requesting still another week to respond -- an extension which would have taken her response up to the eve of the trial date that had been set in a pretrial order entered five months before. The next day, April 30, the district court denied the requested extension. Plaintiff nonetheless filed her belated response on May 7, 2002, the same day that the district court granted summary judgment. The plaintiff later moved for reconsideration, arguing that the court should consider her tardy opposition. The court denied this motion in a detailed unpublished opinion issued on July 11, 2002.

Plaintiff's appellate briefs draw repeatedly on facts and arguments that were included only in the rejected filing, and her notice of appeal encompasses the denial of the motion to reconsider. However, she does not offer any sustained argument that the court erred in denying the initial extension of time or the motion to reconsider. The failure to argue the point means

-4-

that the issue has been waived.  See Donovan v. City of Haverhill, 311 F.3d 74, 76 (1st Cir. 2002).[2]

When the district court granted defendants' summary judgment motion, its findings of fact were based on the defendants' submission of uncontested facts.  See Torres-Rosado, 204 F. Supp. 2d at 253-56 & n.1.[3]  On appeal, we consider the same record that was before the district court.  The uncontested facts are deemed admitted.  A small amount of other material qualifies as part of the summary judgment record, such as a verified objection filed by

---

[2]  Even if we considered the issue, we would find that the district court was well within its discretion.  In its unpublished opinion denying the motion for reconsideration, the court exhaustively chronicled the plaintiff's repeated delays and missed deadlines in this litigation.  The court counted at least fifteen requests for extensions of time by plaintiff, many of which were filed after deadlines had already passed.  Plaintiff did not even serve defendant Torres-Rivera, who was living in Romania at the time, until over a year after filing the complaint.  One motion filed by plaintiff explaining the failure to meet deadlines is entitled, "Plaintiff's Attorney Apologies to the Court."  The district court correctly said that it had been "more than generous" in offering plaintiff repeated extensions of time.  Given the history of the litigation, and the clear deadlines found in both Local Rule 311.5 and the court's November 2001 pretrial order, this decision was quite justifiable.

[3]  There is no merit in the suggestion, advanced by plaintiff at oral argument, that the district court considered the late-filed facts when it rejected the motion to reconsider, so that they are part of the record.  Rather, in its order denying reconsideration, the district court meticulously explained why it rejected plaintiff's filing.  It then, as a matter of its discretion, went on to discuss why, "even if the Court had considered plaintiff's factual problems with [defendants'] uncontested facts . . . it would have arrived at the same conclusion."

plaintiff at an earlier stage of the litigation and some portions of depositions and interrogatories submitted to the court.

B. <u>Factual Background</u>

In October 1998, plaintiff was a career employee of the SIB with approximately fifteen years of experience. She held the title of "Agent III." She also supervised a public integrity squad. Torres-Rivera conferred these supervisory duties on plaintiff; they were not part of plaintiff's status as an Agent III, nor were they assigned through civil service competition.

One of the squad's pending investigations concerned corruption allegations against Aníbal Marrero-Pérez, then the vice president of the Puerto Rico Senate. Plaintiff had a confidential informant who was providing information to her about alleged unlawful behavior by Marrero. Apparently, this informant provided plaintiff with an accusation and some evidence suggesting that Marrero had received an improper payment.

Plaintiff wrote a four-paragraph internal memorandum to Torres-Rivera on October 16, 1998 expressing concerns about the pace of the Marrero investigation. The first and fourth paragraphs of the memo alluded to leads that had been developed in the case.[4] The middle two paragraphs stated:

---

[4] This memo and much of the rest of the record was written in Spanish; we rely on the certified translations provided by the parties.

It is my concern that at present this investigation is paralyzed due to lack of communication with you, since it is you who are authorized to give us instructions whether to proceed or not regarding this case with the aforesaid debriefings.

At the last meeting held with you, you indicated that you would make efforts to verify with the federal agencies whether there was any investigation into this matter to thus know what course of action to follow.

The memo closed, "For your information and appropriate action."

A week later, on Friday, October 23, Torres-Rivera wrote a memo responding to plaintiff. It quoted her accusation of paralysis and then stated:

Your concern is groundless, inasmuch as communication with my office flows openly at my request or at the request of a party. It is by means of your memorandum that I found out about the information you cited. I do not know what your intentions are in making such serious imputations.

In the face of your assertion, I have no other alternative but to withdraw you from my trust as a supervisor . . . .

The memo instructed plaintiff to report for duty to José Ramos, another SIB official, the following Monday.

The same day, Friday, Torres-Rivera and Ramos held a meeting with plaintiff where Torres-Rivera read her this memo aloud and said that plaintiff would be removed from the Marrero investigation. The following Monday, however, Torres-Rivera wrote another memo to plaintiff which reversed this decision and reinstated her as the agent in charge of the Marrero

investigation.[5] This memo concluded, "I reiterate that all the resources necessary to help you conduct this investigation to the consequences that it warrants, will be at your disposal."[6]

During the meeting on Friday, after she had been given the memo and told that she was being removed from the investigation, plaintiff asked that she be allowed to use some accumulated vacation time. She filed a form, which Ramos signed, requesting leave from the following Monday until December 8. Torres-Rivera told her at that meeting that she could commence her leave only after filing a report about the Marrero investigation. After the meeting, but before she left the premises, she told Ramos that she refused to complete the report that she had been ordered to prepare because she did not want to name her informant to another agent.

Plaintiff did not come to work the following Monday, October 26. She telephoned Ramos and told him that her young son was sick and she would be unable to come to the office. She says

_____

[5] The translation submitted to this court indicates that the memo was written on November 26, not October 26, but this appears to be an error, and the district court found that it was written on Monday, October 26. This conclusion makes sense, especially since Torres-Rivera no longer worked at the SIB by November 26.

[6] It is not entirely clear from the record whether this reinstatement also extended to plaintiff's other supervisory duties. Earlier in the litigation, plaintiff stated under oath that she was a supervisor of the squad as well as the investigation "[a]t the time of her dismissal," suggesting that she regained both of her supervisory roles.

that she indicated in this conversation that he had chicken pox and that she was potentially contagious. Also on Monday, Torres-Rivera went to Ramos' office and asked if plaintiff had filed the report; when he found out that she had not done so, he annotated the vacation request form that Ramos had signed, indicating that plaintiff could not take leave until she handed in the report. Meanwhile, plaintiff had attempted to go over Torres-Rivera's head by requesting and receiving an appointment with Rotger-Sabat at 3:00 that day, an appointment she then cancelled. Finally, in another telephone conversation between plaintiff and Ramos that day, Ramos told her that no vacation time was approved until she submitted the report, and she repeated her previous statements about not revealing her confidential informant.

Plaintiff remained out of the office from October 26 until November 20. Her verified statement is that her two-year-old son had chicken pox between October 23 and November 11; that she and her son were both ill with bronchitis between November 11 and November 24 and so she was unable to work; and that regulations instructed her not to go to work if she were exposed to a contagious disease. She later submitted medical documentation to her employer. Defendants have submitted sworn evidence indicating that plaintiff was informed several times during that period that her absence was unauthorized. She has not denied this; she says the SIB acquiesced to her leave by accepting her form.

During her absence, plaintiff did not hand in the report that Torres-Rivera had ordered her to submit. She received a memo on October 30 again instructing her to prepare the status report. Plaintiff does not say that she was physically unable to do so; indeed, her evidence is that she offered to come into the office and prepare the report, but would have to bring her contagious son.

While plaintiff was still out of the office, the newspaper El Vocero published nine articles concerning investigations of Senator Marrero for alleged corruption. Plaintiff denies speaking to journalists or anyone else concerning the case. Another El Vocero article in November reported that materials for santería rituals were found in plaintiff's SIB car and suggested that she was practicing witchcraft against Torres-Rivera and other government officials. Plaintiff, a Roman Catholic, says the story was baseless.

Also during plaintiff's absence, Torres-Rivera left his position as director of the SIB; his last day was November 16. On that final day, he wrote a complaint, which he gave to Attorney General Fuentes-Agostini, requesting a disciplinary investigation of plaintiff. This complaint began by discussing the original memo from plaintiff, stating that it "described in writing a situation of lack of communication with the undersigned Director, alluding that for those reasons an investigation was paralyzed." It said that Torres-Rivera had removed plaintiff from her supervisory

position because of "the falseness of the imputations" and complained about her ignoring the chain of command by trying to meet with Rotger-Sabat. It went on to characterize her absence as unauthorized; there is no indication in the complaint that plaintiff had ever requested or received approval for sick time. Because the department's inspector general was friendly with plaintiff, she recused herself from any such inquiry, and Fuentes-Agostini assigned another employee, Itala Rivera-Buonomo, to investigate plaintiff for "improper conduct."

Plaintiff returned to work on November 20, before the end of her requested leave. It is unclear if she had learned of Torres-Rivera's complaint, but that day she received a hand-delivered letter from Rivera-Buonomo informing her of the internal investigation of her conduct. Enclosed with the letter were various documents on which the investigation relied, including copies of Torres-Rivera's complaint and a memo from another SIB official, Carlos Riestra-Cortés, discussing her absence. Plaintiff delivered the report on the Marrero investigation on November 20; it was deemed unsatisfactory and she submitted a revised version four days later, which was also deemed unsatisfactory. On November 24, she turned in medical certificates and again requested regular vacation leave.

Rivera-Buonomo prepared a preliminary report about her investigation on December 9, 1998. According to the report,

-11-

plaintiff had again been out of the office since November 24. Rivera-Buonomo concluded that, because plaintiff failed to follow rules concerning permission for absences, she had been "absent from her job from October 26, 1998 until November 20th without having her absence . . . authorized for any reason." The report also recounted sworn testimony by Ramos that plaintiff had told him she refused to write the report about the Marrero investigation, in part because she did not want others to speak with her confidential informant, and that if Torres-Rivera "wanted information, that he should search for it." Rivera-Buonomo determined that this constituted insubordination. It is an uncontested fact that agents must disclose confidential sources to their supervisors upon request.

On January 28, 1999, Fuentes-Agostini suspended plaintiff with pay and sent her a detailed letter informing her of the decision and the reasons for it, which were based on Rivera-Buonomo's conclusions that plaintiff was absent without leave and insubordinate. Plaintiff appealed, and an administrative hearing concerning the charges was held on April 9, 1999. Plaintiff was represented by counsel and had the opportunity to present evidence and testimony. The hearing officer found that plaintiff's sick leave was not authorized, and that she resisted handing in her report because she did not want anyone else communicating with her confidential informant. As a result, he concluded that she had

been absent without leave and had disobeyed orders, and that dismissal was warranted. Plaintiff's employment was terminated on June 30, 1999.

Plaintiff filed a defamation suit against Torres-Rivera in the Puerto Rico courts in November 1999, which alleged that he was the source for El Vocero's santería story. In June 2001, a new attorney general reached a settlement of this defamation suit whereby plaintiff was reinstated with back pay. Plaintiff had filed her federal case on July 14, 2000.[7]

II.

Even where the record is circumscribed because summary judgment was unopposed, a district court may grant summary judgment against the nonresponding party only "if appropriate." See Fed. R. Civ. P. 56(e). "Under this provision it is clear that where the evidentiary matter in support of the motion does not establish the absence of a genuine issue, summary judgment must be denied even if no opposing evidentiary matter is presented." NEPSK, Inc. v. Town of Houlton, 283 F.3d 1, 7 (1st Cir. 2002) (quotation omitted); see Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991) (in considering unopposed summary judgment motion, "[o]f course, the district court was still obliged to consider the motion on its

_____

[7] Although the settlement mooted much of the relief plaintiff had sought, her federal complaint also pled emotional distress damages, including "partial hospitalization in a mental institution and a miscarriage." The record before us contains no evidence of these damages.

-13-

merits").  We look at the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," Fed. R. Civ. P. 56(c), and we apply the familiar de novo standard of review.  See Mullen v. St. Paul Fire & Marine Ins. Co., 972 F.2d 446, 452 (1st Cir. 1992).  Plaintiff "may not rest upon the mere allegations or denials of [her] pleading." Fed. R. Civ. P. 56(e).  An unsworn assertion of fact in the complaint alone is not enough to create a material factual dispute.

A.  Procedural Due Process

Plaintiff alleges her right to procedural due process under the Fourteenth Amendment was violated, first when she was removed from her supervisory duties (but not from her status as an Agent III), then when she was suspended with pay, and finally when she was terminated.  Constitutional procedural due process protects only those aspects of public employment recognized as property interests; we refer to Puerto Rico law for guidance in defining such interests.  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 538 (1985); Figueroa-Serrano v. Ramos-Alverio, 221 F.3d 1, 5-6 (1st Cir. 2000).

Plaintiff's supervisory duties alone do not qualify as such a protected interest -- even if we assume, despite indications to the contrary in her own sworn statement, that they were eliminated permanently.  It was uncontested that the supervisory

-14-

duties were conferred on a discretionary basis to those of the rank of Agent III "who held the trust of the Director of the SIB." Torres-Rosado, 204 F. Supp. 2d at 254. Plaintiff was assigned these duties without any civil service competition. Id. Thus, she cannot demonstrate that Puerto Rico's public employment law created any "reasonable expectation, arising out of a statute, policy, rule, or contract," that she would continue to perform supervisory duties. Wojcik v. Mass. State Lottery Comm'n, 300 F.3d 92, 101 (1st Cir. 2002). Torres-Rivera wrote in his memo to plaintiff that he had decided to "withdraw you from my trust as a supervisor." He did not violate procedural due process by doing so. See Figueroa-Serrano, 221 F.3d at 7 ("Without career status, the plaintiffs do not have a constitutionally protected property interest in continued employment . . . .").

Due process requirements do not attach to the paid suspension either, at least on the facts of record in this case. The Supreme Court explained in Loudermill that a government employer who wishes to remove a worker immediately may suspend that worker with pay until the procedures associated with termination can be completed. 470 U.S. at 544-45. That is exactly what happened here. More recently, a unanimous Supreme Court rejected a categorical rule imposing constitutional due process requirements on suspensions without pay. See Gilbert v. Homar, 520 U.S. 924, 929-30 (1997) ("Due process is flexible and calls for such

-15-

procedural protections as the particular situation demands.") (quoting <u>Morrissey</u> v. <u>Brewer</u>, 408 U.S. 471, 481 (1972)). The <u>Gilbert</u> Court also called the deprivation in such cases "relatively insubstantial." <u>Id.</u> at 932. Plaintiff's paid suspension in this case, which caused only a very temporary deprivation of job functions and no financial loss, did not give rise to any constitutional entitlement to due process.[8]

The termination of her employment, however, did require due process. It is well-established under Puerto Rico law and First Circuit precedents that career employees in positions such as plaintiff's -- and who are not in political or policymaking positions, <u>cf.</u> <u>Flynn</u> v. <u>City of Boston</u>, 140 F.3d 42, 45 (1st Cir. 1998) -- are entitled to due process in association with their termination. <u>See</u> <u>Acosta-Orozco</u> v. <u>Rodriguez-De-Rivera</u>, 132 F.3d 97, 104 (1st Cir. 1997). The crucial question becomes: what process was due? This is an issue of federal law. <u>See</u> <u>Loudermill</u>, 470 U.S. at 541; <u>Vitek</u> v. <u>Jones</u>, 455 U.S. 480, 491 (1980).

---

[8] Numerous courts have held that paid suspensions could be imposed without the sorts of procedures the Constitution demands for terminations of career employees who have proprietary interests in their jobs. <u>Pratt</u> v. <u>Ottum</u>, 761 A.2d 313, 320 (Me. 2000) (collecting cases); <u>see, e.g.,</u> <u>Hicks</u> v. <u>City of Watonga</u>, 942 F.2d 737, 746 n.4 (10th Cir. 1991); <u>Koelsch</u> v. <u>Town of Amesbury</u>, 851 F. Supp. 497, 500 (D. Mass. 1994). Still, it is conceivable that a very long or open-ended paid suspension might function so much like a termination that some due process protection might attach. We need not consider that prospect here.

Plaintiff received far more than the minimum elements of procedural due process: "some kind of a hearing" and an opportunity to respond to the allegations against her. Loudermill, 470 U.S. at 542; see O'Neill v. Baker, 210 F.3d 41, 47-48 (1st Cir. 2000). The day she returned to the office, November 20, 1998, she received notice of the investigation and a copy of the documents enumerating the allegations against her. When the investigation was complete, the January 28, 1999, letter informed plaintiff of its specific conclusions, that she faced possible termination, and that she had a right to a hearing before such action was taken. Finally, the hearing on April 9, 1999, was conducted before an examining officer, plaintiff was accompanied by counsel, plaintiff herself testified, and she had the opportunity to present other witnesses and evidence.

We do not review the substance of decisionmaking under the rubric of procedural due process analysis. See Bishop v. Wood, 426 U.S. 341, 349-50 (1976). Plaintiff alleges that the procedures employed departed from applicable regulations under Puerto Rico law. An agency's failure to follow its own rules may be significant in administrative law, but the federal Due Process Clause does not incorporate the particular procedural structures enacted by state or local governments; these claims should be pursued, if at all, under Puerto Rico law. See O'Neill, 210 F.3d at 49 n.9.

-17-

Plaintiff also argues that she was not given sufficient warning of the evidence to be used against her at the hearing, as she says Arnett v. Kennedy, 416 U.S. 134 (1974), requires. We disagree. The original complaint by Torres-Rivera and the January 28 letter laid out in detail the allegations and findings that provided cause for termination. There was no unfair surprise to plaintiff or her attorney. This was "an explanation of the employer's evidence" which, combined with notice and an opportunity to respond, satisfied the requirements of procedural due process. Loudermill, 470 U.S. at 546 (explaining Arnett).

B.  First Amendment

A government employee "may not be dismissed for exercising rights protected under the First Amendment." Hennessy v. City of Melrose, 194 F.3d 237, 245 (1st Cir. 1999). At the same time, that employee's free speech rights must be balanced against "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968); see Rankin v. McPherson, 483 U.S. 378, 384 (1987); Connick v. Myers, 461 U.S. 138, 140 (1983).

The line of Supreme Court cases striking this balance has yielded a three-part test, which this court summarized in O'Connor v. Steeves, 994 F.2d 905, 912-13 (1st Cir. 1993). The court must first determine whether the issue about which the employee spoke

was a "matter of public concern;" if not, there is no claim for First Amendment protection.  <u>Connick</u>, 461 U.S. at 146; <u>see</u> <u>Tang</u> v. <u>Rhode Island</u>, 163 F.3d 7, 12 (1st Cir. 1998).  Second, the court evaluates the balance between the employee's First Amendment interests and the government's interests as an employer.  <u>See</u> <u>Rankin</u>, 483 U.S. at 388; <u>Mullin</u> v. <u>Town of Fairhaven</u>, 284 F.3d 31, 39-41 (1st Cir. 2002).  Finally, if the claim survives both of these tests, the plaintiff employee must show that the protected speech was a substantial or motivating factor behind the adverse employment action; the burden then shifts to the government employer to demonstrate by a preponderance of the evidence that it would have taken the same action absent the protected speech.  <u>See</u> <u>Mt. Healthy City Sch. Dist. Bd. of Educ.</u> v. <u>Doyle</u>, 429 U.S. 274, 287 (1977); <u>Wytrwal</u> v. <u>Saco Sch. Bd.</u>, 70 F.3d 165, 170 (1st Cir. 1995).   While the first two tests are typically legal determinations subject to de novo review, the third is a question of fact which normally belongs to the jury.  <u>Nethersole</u> v. <u>Bulger</u>, 287 F.3d 15, 18-19 (1st Cir. 2002); <u>O'Connor</u>, 994 F.2d at 912-13.

The district court here disposed of plaintiff's First Amendment claim at the initial stage, finding that her speech was not about a matter of public concern.[9]  It concluded that

_____

[9]   Plaintiff's complaint presents the alleged First Amendment infractions as three different claims:  freedom of speech as a public employee, unlawful retaliation, and whistleblower protection.  Since she appeals under the First Amendment and not under Puerto Rico law, the substantive issues raised by these

-19-

> the matters in the case at bar relate to the fundamental inner workings of an office -- that Plaintiff perceived the investigation was proceeding too slowly. While [allegations of] corruption in the Puerto Rican senate are certainly matters of public concern, the investigation itself, or how it is progressing, is entirely an internal matter, and not of public concern. That is to say, while the end result might be a matter of public concern, the means to that end[] is not.

Torres-Rosado, 204 F. Supp. 2d at 260.

As a matter of law, the district court too narrowly evaluated the nature of the public concern in context. In essence, some months before plaintiff wrote her October 16, 1998 memo, she had been told that she should hold off on her investigation of Marrero while her supervisors checked to see if federal authorities were also investigating him. When she heard nothing, she expressed concern that "at present this investigation is paralyzed due to lack of communication with you, since it is you who are authorized to give us instructions whether to proceed or not." "Paralyze" is defined as "to deprive of strength or activity; make powerless; make ineffective." Webster's Third New International Dictionary 1638 (1993). The public is concerned about more than just the "end result" of the investigation of an elected official. The public is also concerned, and understandably so, about whether government investigations of political corruption are influenced improperly or are derailed by political connections. Plaintiff's interpretation of her memo to Torres-Rivera is that the word "paralyzed"

---

claims are essentially identical and we consider them together.

represented "an elegant way of accusing him of being engaged in a cover up." Certainly Torres-Rivera's response to the memo suggests that he understood it in exactly that way.

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." Connick, 461 U.S. at 147-48. Even if the content of the employee's speech on its face relates largely to the internal affairs of the government agency, Connick requires a more searching contextual analysis to determine if the speech implicates matters of public concern as well. See id. at 148-49 (assistant district attorney distributed survey to her colleagues asking their opinions about the functioning of the office; most questions related to internal matters that were not of public concern, but one asking whether employees felt pressure to work in political campaigns passed this initial inquiry and court went on to the second test); O'Connor, 994 F.2d at 914 (interpreting Connick to require more searching inquiry even where speech "would not necessarily qualify, on the basis of its content alone, as a matter of inherent public concern").

Under Connick's directive to examine "the whole record," it is difficult to understand Torres-Rivera's heated reaction to plaintiff's memo if it truly signified only an internal concern about intra-office communication or the pace of investigative work.

-21-

Torres-Rivera's memo characterized her statements as "serious imputations" that left him "no other alternative but to withdraw you from my trust." He had already halted the investigation in order to make inquiries with federal authorities about their possible parallel inquiries, but had not ordered the SIB's investigation resumed. He then removed plaintiff from the investigation; the fact that he reinstated her a few days later does not negate an interpretation that he read her memo as involving charges of cover-up and obstruction. Significantly, Torres-Rivera's strong reaction happened before other issues arose -- such as plaintiff's absence from the office and the dispute over the report -- that might otherwise explain his displeasure with her. We find, contrary to the district court's conclusion, that the "public concern" test was satisfied here.[10] Cf. Nethersole, 287 F.3d at 18 n.5 (memo seeking meeting to discuss "concerns" about diversity at university survived first test at Rule 12(b)(6) stage).

Since we may affirm summary judgment "on any basis that is manifest in the record," John G. Danielson, Inc. v. Winchester-Conant Props., Inc., 322 F.3d 26, 37 (1st Cir. 2003), we go on. We

---

[10] It is true that plaintiff did not speak publicly about her cover-up accusation; indeed, she specifically denied that she had done so. But the First Amendment protects employee speech about matters of public concern even if the employee does not seek to make that speech to an audience outside the workplace. Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 414 (1979); see also Rankin, 483 U.S. at 387; O'Connor, 994 F.2d at 916.

-22-

will assume without deciding that plaintiff satisfies the second test. In general, government interests outweigh First Amendment rights when employee speech prevents efficient provision of government services or disrupts the workplace. See Rankin, 483 U.S. at 388-89; Connick, 461 U.S. at 152-54; see also Hennessy, 194 F.3d at 248 (teacher's immoderate, intransigent, and public criticism of curriculum undermined operation of school). Here, however, plaintiff wrote a private memo which she worded fairly diplomatically; it is difficult to think of a less disruptive manner in which plaintiff might have communicated. See O'Connor, 994 F.2d at 915-17 (town employee who disclosed alleged wrongdoing by a town selectman to the full Board of Selectmen passed second test, despite the fact that he also had personal reasons for doing so).

We will likewise assume that plaintiff has met her initial burden under the third test to create a question of fact for the jury as to whether the memo was at least a substantial or motivating factor in her termination. Mt. Healthy, 429 U.S. at 287. After all, it was Torres-Rivera's complaint about her, shortly after her memo to him, that initiated the investigation, and plaintiff need not produce a "smoking gun" to carry this burden. Lewis v. City of Boston, 321 F.3d 207, 219 (1st Cir. 2003).

All of this is to no avail for plaintiff if, under the third test, the defendants have met their burdens of both persuasion and proof to demonstrate other reasons for the adverse actions besides her speech. The uncontested facts and the documentation submitted by defendants supply several such reasons. Plaintiff, as the party opposing summary judgment, has not produced any evidence creating a material issue of fact that she would not have been terminated in any event for insubordination or for absenteeism. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

Defendants' uncontested evidence that plaintiff would have been terminated anyway is buttressed by the conclusions reached during the administrative investigation and appeal. The report by Rivera-Buonomo concluded that plaintiff violated several departmental policies unconnected to her speech. It found that plaintiff was absent without authorization for a prolonged period and that she disobeyed several direct orders to submit a report on the investigation, which constituted insubordination. Moreover, the uncontested fact is that she was required to identify her informant to her supervisors; refusal to do so amounted to insubordination. The record plainly shows insubordination.

Defendants also submitted a sworn statement from the hearing officer, who concluded there was both unauthorized absence and insubordination, and who says that he decided the issues at the

hearing "based on the law and the evidence there presented. No other factors were taken into consideration when deciding on the facts of the hearing . . . and no one intervened with my recommendations, either before or after the hearing." Plaintiff testified at that hearing and was represented there by an attorney. The defendants have offered ample uncontested evidence that the same decisions as to her employment would have been reached whether or not plaintiff sent the memo to Torres-Rivera. See Mt. Healthy, 429 U.S. at 285; Wytrwal, 70 F.3d at 171.[11]

Plaintiff protests in her brief to us that these determinations, made during the disciplinary process, were factually incorrect in various ways. We assume that it would be probative for plaintiff if she could show she was subjected to a biased kangaroo court in the disciplinary process. But her objections come too late. Even assuming, dubitante, that such evidence exists, she failed to contest these facts before the district court within the deadlines established by the local rules, and to provide evidence -- not just assertions -- that the process

_____

[11] As to the change in plaintiff's duties, as discussed above, plaintiff's own sworn statement indicates that this change was temporary. The only remedies still at stake in the case are emotional distress and similar damages, and plaintiff has not adequately demonstrated that she suffered any such harm from whatever changes in duties occurred. See Memphis Cmty. Sch. Dist. v. Stachura, 477 U.S. 299, 309-10 (1986) (damages in § 1983 case based on First Amendment must be compensatory). This is not a situation comparable to Nethersole, 287 F.3d at 17, where a university's statewide vice president was transferred to another campus and made an assistant dean.

had been biased and flawed.  Plaintiff has lost the right to make these arguments.  Parties ignore rules such as Local Rule 311.12 at their peril.  Ruiz-Rivera, 209 F.3d at 27-28.  "[T]he decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence.  This case is no exception."  Kelly, 924 F.2d at 358.

Because defendants have carried their Mt. Healthy burden on the facts of record, the First Amendment claim fails.

C.  Conspiracy

Finally, plaintiff alleges a conspiracy to deprive her of civil rights, actionable under 42 U.S.C. §§ 1983 and 1985(3).  Under § 1985(3), a conspiracy must be motivated by some "racial, or perhaps otherwise class-based, invidiously discriminatory animus."  Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 268-69 (1993) (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)); see Romero-Barcelo v. Hernandez-Agosto, 75 F.3d 23, 34 (1st Cir. 1996).  Plaintiff failed to offer any indication whatsoever that this threshold requirement of class-based animus has been met.

To demonstrate conspiracy under § 1983, plaintiff must show "an actual abridgement of some federally-secured right."  Nieves v. McSweeney, 241 F.3d 46, 53 (1st Cir. 2001) ("The fact that a plaintiff styles her claim as a conspiracy . . . does not diminish her need to show a constitutional deprivation."); see Earle v. Benoit, 850 F.2d 836, 844 (1st Cir. 1988).  Plaintiff

cannot resuscitate her failed constitutional claims to prove conspiracy. Summary judgment was proper against both claims.

III.

For the reasons stated in this opinion, the judgment of the district court is **affirmed**. Costs are awarded to defendants.