# United States Court of Appeals
## For the First Circuit

No. 10-2316

JOHN COLLINS,

Plaintiff, Appellant,

v.

UNIVERSITY OF NEW HAMPSHIRE; BRUCE MALLORY, in his official
capacity as Provost and Executive Vice President of the
University of New Hampshire; ROBERT C. WHITTEN, in his official
capacity as Police Officer of the University of New Hampshire
Police Department,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Landya B. McCafferty, U.S. Magistrate Judge]

Before

Lynch, Chief Judge,
Torruella and Howard, Circuit Judges.

Paul McEachern, with whom Shaines & McEachern, PA, was on
brief for appellant.
Martha Van Oot, with whom John L. Arnold and Orr & Reno, PA,
was on brief for appellees.

December 20, 2011

**TORRUELLA**, **Circuit Judge**.  John Collins, ("Collins"), a professor at the University of New Hampshire ("UNH"), was arrested and charged with stalking and disorderly conduct after unleashing an expletive-filled tirade against a colleague whom he suspected of causing him to receive a parking ticket.  Although the charges were later dismissed, Collins sued UNH and various UNH officials for false arrest, defamation, and violation of his due process rights.  The district court granted judgment on the pleadings for the defendants on the false arrest counts, and later granted summary judgment for the defendants on the due process and defamation counts.  See Collins v. Univ. of N.H. (Collins I), No. 09-cv-78, 2010 U.S. Dist. LEXIS 26436 (D.N.H. March 15, 2010); Collins v. Univ. of N.H. (Collins II), 746 F. Supp. 2d 358 (D.N.H. 2010).  Collins now appeals these rulings.  After careful review, we affirm the decisions of the district court.

## I. Background

### A. Outburst and Subsequent Criminal and Disciplinary Proceedings

Collins is a tenured associate professor of Biochemistry and Molecular Biology in the College of Life Sciences and Agriculture ("COLSA") at UNH.  At the time of the incidents underlying this case, he was also the Chair of the Department of Biochemistry and Molecular Biology.  On the morning of June 28, 2007, Collins received a parking ticket from UNH Parking Services for being parked in a loading zone beyond the 30-minute limit.

-2-

Collins suspected that one of his colleagues, Professor Stacia Sower ("Sower"), had reported his car to Parking Services, as she had done on a previous occasion. As Collins waited for the elevator in the lobby of Rudman Hall, the building that housed his office and Sower's, he encountered Bernadine Schultz ("Schultz"), an assistant to Professor Sower, and Mihael Fremat ("Fremat"), a graduate student. Schultz observed that Collins appeared agitated and suggested that he let out his angry thoughts. Collins responded with an expletive-laden tirade against Sower, stating several times that he could "kill that fucking bitch." Collins also kicked a large trash can. Six people, including Schultz and Fremat, either saw or heard Collins's outburst.

Soon afterwards, Sower passed Collins in the hallway, but the two exchanged no words or gestures. At around 1:00 p.m., Collins went to the office of COLSA Dean William Trumble ("Trumble") to report his outburst. Collins was calm and acknowledged that his conduct was inappropriate. He vowed not to repeat such conduct.

Sower was apparently not perturbed when she first heard about Collins's outburst. Witnesses reported that Sower shrugged her shoulders and said, "no big deal, oh yeah, that's John Collins." Nevertheless, at approximately 3:00 p.m., Schultz informed Collins that she had reported his outburst to UNH Police. Later, at around 5:30 p.m., two UNH police officers approached

Collins and told him that Sower had reported that she was fearful of his presence in Rudman Hall. Collins assured the officers that he planned to be in the building only briefly, and left soon afterwards.

At around the same time, various UNH administrators and UNH Police Chief Paul Dean ("Dean") exchanged emails discussing the filing of criminal charges against Collins. The emails indicate that Dean and the administrators planned to have UNH Police charge Collins with disorderly conduct. The officials also discussed whether or not UNH should issue a press release about the incident. Kim Billings ("Billings"), a UNH spokeswoman, proposed two options. The first option was to proactively issue a press release. Billings suggested that this option might be appropriate "given the heightened awareness around violence on campus." The second option was to draft a press release but wait to issue it until the media contacted UNH. Billings wrote that the first option "seems too strong at first blush, but again, we are just erring on the side of over-communicating given Va. Tech." "Va. Tech." referred to the April 6, 2007 shooting at Virginia Polytechnic Institute ("Virginia Tech") in which thirty-two people were killed.

The next morning, June 29, 2007, UNH campus police arrested Collins on a warrant charging not only disorderly conduct, but also stalking. In his sworn statement in support of the arrest warrant, UNH Police Officer Robert C. Whitten ("Whitten") averred

-4-

that Collins engaged in a course of conduct that caused Sower to reasonably fear for her safety. The same morning, Sower filed a petition with the Superior Court in Strafford, New Hampshire, seeking a restraining order preventing Collins from entering the Rudman complex and coming near Sower or her students. The court denied this request, but issued an order restraining Collins from having any direct or indirect contact with Sower.

Also on the morning of June 29, Professor Rick Cote ("Cote"), a faculty member in COLSA, learned that UNH Provost Bruce Mallory ("Mallory") planned to ban Collins from the campus. Cote and Alberto Manelo ("Manelo"), the Associate Dean of COLSA, met with Mallory to protest this plan, telling Mallory that they did not think Collins posed a risk to anyone. Mallory was not swayed, however, and referred to the Virginia Tech incident in his conversation with Cote and Manelo.

The ban went into effect the afternoon of June 29. Collins was also placed on administrative leave with pay and suspended from his department chair position. At approximately 5:00 p.m., Mallory had an email sent to all COLSA faculty and staff containing a press release announcing the arrest. The email also stated that Collins had been banned from campus and instructed that "[a]nyone who sees Dr. Collins anywhere on campus should avoid contact with him and immediately notify the UNH Police Department."

-5-

Over the next few months, various faculty members complained to Mallory about his treatment of Collins and about disruptive behavior by Sower. On August 20, 2007, Collins and his counsel met with Mallory. Collins provided his account of the incident and asked that the ban be lifted. Mallory invited Collins to explain in writing why the ban should be lifted. Collins responded on September 4, 2007. In the meantime, on August 30, 2007, Mallory received the report regarding UNH's investigation into the incident, which included interviews with over twenty faculty and staff. The people interviewed did not view Collins as being a threat to anyone, and the report concluded that the incident did not rise to the level of a hostile work environment under UNH's Discriminatory Harassment Policy.

On September 10, 2007, Mallory responded to Collins's letter requesting that the ban be lifted. Mallory found that Collins behaved unprofessionally, exercised poor judgment, "failed to be an effective leader and role model," and created an "air of intimidation in the workplace." Based on these findings, Mallory removed Collins from his position as department chair. Mallory also left the campus ban and the paid suspension from the COLSA faculty in place. In addition, Mallory ordered Collins to apologize to Sower in writing and to attend an anger-management class. Mallory stated that the suspension and ban would continue

-6-

until Collins complied with these directives and until any criminal and civil cases against him were resolved.

After a trial in the Durham, New Hampshire District Court on October 23, 2007, Collins was cleared of the stalking and disorderly conduct charges for which he was arrested on June 29. At various times during the fall and winter of 2007, Collins was given permission to enter the campus for specified events, including attending his children's sporting events and helping his daughter move into her dormitory. On January 15, 2008, Mallory wrote a letter to Collins informing him that the suspension and ban had been lifted and that Collins could return to campus and to his faculty duties on January 22, 2008. However, Mallory did not reinstate Collins to his position as department chair.

## B. Procedural History

On March 9, 2009, Collins filed suit against UNH, Mallory, and Whitten in the United States District Court for the District of New Hampshire. Collins's Complaint contained four counts: (1) a Fourth Amendment false arrest claim against Whitten and UNH for the arrest on the disorderly conduct charge; (2) a similar false arrest claim for the arrest on the stalking charge; (3) a Fourteenth Amendment[1] due process claim against Mallory and

---

[1] The Complaint alleged a violation of Collins's due process rights under the Fifth Amendment rather than under the Fourteenth Amendment. Because there are no Federal defendants in this case, a claim under the Fifth Amendment would fail. See Martínez-Rivera v. Sánchez-Ramos, 498 F.3d 3, 8-9 (1st Cir. 2007). However, the

UNH for the campus ban, the suspension, and the loss of his department chair position; and (4) a defamation claim. The defendants moved for judgment on the pleadings as to the two false arrest claims. The court granted this motion on March 15, 2010, finding that there was probable cause for the warrant on both charges and that the arrest was valid under New Hampshire law. See Collins I, 2010 U.S. Dist. LEXIS 26436. Collins filed an Amended Complaint on April 21, 2010, that contained essentially the same allegations and counts as the original Complaint. The defendants moved for judgment on the pleadings on the two false arrest counts in the Amended Complaint, and the district court granted this motion on May 5, 2010.

On October 8, 2010, the court granted summary judgment for the defendants on the due process and defamation counts. Collins had alleged that the defendants violated his due process rights in three ways. First, Collins, alleged that the defendants improperly deprived him of a property interest by suspending him with pay without a prior hearing. However, the district court rejected this argument, relying on this Court's holding in Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 9-10 (1st Cir. 2003), that public employees are not entitled to pre-suspension process if they are suspended with pay. Collins II, 746 F. Supp. 2d at 369.

---

district court construed the Complaint to allege a Fourteenth Amendment violation rather than a Fifth Amendment violation.

Second, Collins alleged that the defendants deprived him of his liberty interest in entering the UNH campus when they imposed the ban. However, the court held that because Collins's liberty interest in coming to campus for work-related purposes was indistinguishable from his interest in his job, he was not entitled to any process before being banned. Id. at 370. In addition, to the extent that Collins had an interest in coming to campus for other purposes, the court held that he was not deprived of that interest because the ban was temporary and subject to exceptions. Id. at 370-71. Finally, Collins had argued that the defendants improperly deprived him of a property interest by removing him from his position as department chair. However, the court found that Collins was accorded adequate process, including multiple meetings with Mallory and an opportunity to submit a written statement. Id. at 371-72.

As for the defamation count, Collins had alleged that the statement in the email to COLSA faculty and staff that "[a]nyone who sees Dr. Collins anywhere on campus should avoid contact with him and immediately notify the UNH Police Department" defamed him because it implied that he was "armed and dangerous." However, the district court held that the statement at most implied that he was dangerous, and that given Collins's outburst, the statement was substantially true. Id. at 374. Furthermore, New Hampshire recognizes a qualified privilege for untrue statements if they were

made in good faith, without malice, and with reasonable belief in their truth.  See Simpkins v. Snow, 661 A.2d 772, 776-77 (N.H. 1995).  The district court found that the privilege applied. Collins II, 746 F. Supp. 2d at 374.[2]

Collins now appeals the district court's rulings on all four counts.

## II.  Discussion

### A. Standard of Review

We review a district court's decision to grant a motion for judgment on the pleadings applying the same standard as that used for reviewing a grant of a motion to dismiss.  See Citibank Global Mkts., Inc. v. Santana, 573 F.3d 17, 23 (1st Cir. 2009). Under this standard, we review the district court's decision de novo, accepting all well-pleaded facts as true and drawing all reasonable inferences in favor of the non-moving party.  Id.  To survive a motion for judgment on the pleadings, "the complaint must plead facts that raise a right to relief above the speculative level, . . . such that entitlement to relief is plausible."  Id. (citation omitted).

---

[2]  Collins also claimed that the statement in the press release that he had been placed on administrative leave was defamatory. However, under New Hampshire law, "[a] statement is not actionable for defamation if it is substantially true."  Simpkins, 661 A.2d at 776.  Thus, because this statement was a true factual assertion that Collins had been placed on leave, the district court held that it was not actionable.  See Collins II, 746 F. Supp. 2d at 373. Collins does not challenge this ruling on appeal.

-10-

We also review a district court's grant of summary judgment de novo. Mulloy v. Acushnet Co., 460 F.3d 141, 145 (1st Cir. 2006). We must construe "the record in the light most favorable to the nonmovant and resolv[e] all reasonable inferences in that party's favor" while safely ignoring "conclusory allegations, improbable inferences, and unsupported speculation." Carroll v. Xerox Corp., 294 F.3d 231, 237 (1st Cir. 2002) (citation and internal quotation marks omitted). In doing so, "we are not married to the trial court's reasoning but, rather, may affirm on any independently sufficient ground made manifest by the record." Cahoon v. Shelton, 647 F.3d 18, 22 (1st Cir. 2011).

## B. False Arrest on Disorderly Conduct Charge

Collins argues that his arrest for disorderly conduct was an unreasonable seizure in violation of his Fourth Amendment rights. "When there is probable cause for an arrest, the Fourth Amendment's prohibition against unreasonable searches and seizures is not offended." Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 9 (1st Cir. 2004). Collins concedes that there was probable cause to charge him with disorderly conduct. However, he argues that it was illegal to arrest him for disorderly conduct because New Hampshire law does not permit such an arrest.

In New Hampshire, "[d]isorderly conduct is a misdemeanor if the offense continues after a request by any person to desist; otherwise, it is a violation." N.H. Rev. Stat. Ann. § 644:2(VI).

-11-

The complaint against Collins described his offense as a "violation." Collins argues that because he was only charged with a "violation," it was illegal for the UNH Police to arrest him. Collins points out that under New Hampshire law, a person convicted of a violation does not face incarceration; rather, the person "may be sentenced to conditional or unconditional discharge, or a fine." Id. § 651:2(III-a). Collins also argues that the New Hampshire Criminal Code makes a distinction between "crimes" and "violations." See id. § 625:6 ("No conduct or omission constitutes an offense unless it is a crime or violation under this code or another statute.") (emphasis added). Finally, Collins points to the definition of "arrest" in the criminal code, which is "the taking of a person into custody in order that he may be forthcoming to answer to the commission of a crime." Id. § 594:1(I) (emphasis added). Because the definition of "arrest" refers to a "crime," and because of the alleged distinction between crimes and violations, Collins argues that his arrest was illegal. We find no merit in Collins's argument.

In State v. Miller, the New Hampshire Supreme Court rejected the argument that a person cannot be arrested for an offense classified as a "violation," holding that "the use of the word 'crime' [in § 594:1] was not intended as a word of limitation but rather to encompass broadly all offenses prohibited by statute or ordinance." 348 A.2d 345, 347 (N.H. 1975). Collins attempts to

-12-

distinguish Miller by arguing that disorderly conduct is a "civil offense" rather than a "criminal offense." However, the disorderly conduct statute, N.H. Rev. Stat. Ann. § 644:2, is part of the Criminal Code of New Hampshire, and Collins provides no support for the proposition that an offense defined in the Criminal Code is somehow civil in nature.

Collins also appears to argue that the Constitution prohibits arrest for offenses that do not involve the potential for incarceration. However, the Supreme Court flatly rejected this argument in Atwater v. City of Lago Vista, 532 U.S. 318, 346-348 (2001) (upholding arrest for a misdemeanor seatbelt violation punishable only by a fine under Texas law and rejecting a rule "forbidding custodial arrest, even upon probable cause, when conviction could not ultimately carry any jail time").

Because there was probable cause for Collins's arrest on the disorderly conduct charge, Collins has no plausible entitlement to relief on his claim that the arrest violated his Fourth Amendment rights. Therefore, we affirm the district court's grant of judgment on the pleadings to the defendants on this count.

## C. Stalking

Regarding the false arrest count on grounds of stalking, Collins alleged that the warrant pursuant to which he was arrested was invalid. The district court held that the warrant was valid because it was supported by probable cause. Collins argues on

appeal that the district court had insufficient evidence before it to conclude that the warrant was valid.

Ordinarily, "[a] magistrate's 'determination of probable cause should be paid great deference by reviewing courts.'" Illinois v. Gates, 462 U.S. 213, 236 (U.S. 1983) (quoting Spinelli v. United States, 393 U.S. 410, 419 (U.S. 1969)).[3] Here, however, the record before the district court did not contain the documents that were presented to the New Hampshire justice of the peace who issued the arrest warrant. Thus, Collins argues, the district court could not have conducted any review of the warrant, even the deferential review required under Gates.

We reject Collins's argument. There is no support for Collins's proposition that a reviewing court must examine all of the documents presented to the court that issued a warrant in order to determine whether the warrant was supported by probable cause. The reviewing court's task is simply to "ensure that the magistrate had a 'substantial basis for concluding' that probable cause existed." Id. at 238-39 (quoting Jones v. United States, 362 U.S. 257, 271 (1960)) (alterations in quotation omitted). Here, the district court had before it ample undisputed evidence to conclude that the warrant was supported by probable cause.

_____

[3]  Although Gates discusses probable cause in the context of a search, we have applied Gates in cases discussing probable cause for an arrest. See, e.g., Wilson v. City of Boston, 421 F.3d 45, 54 (1st Cir. 2005); Burke v. Town of Walpole, 405 F.3d 66, 79-80 (1st Cir. 2005).

Probable cause exists "if 'the facts and circumstances within [the issuing judge's] knowledge and of which they had reasonably reliable information' would suffice to 'warrant a prudent person believing' that a person has committed . . . a crime." Burke, 405 F.3d at 80 (quoting Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 254 (1st Cir. 1996)). Under New Hampshire law, stalking is defined as, inter alia, "[p]urposely, knowingly, or recklessly engag[ing] in a course of conduct targeted at a specific person which would cause a reasonable person to fear for his or her personal safety or the safety of a member of that person's immediate family, and the person is actually placed in such fear." N.H. Rev. Stat. Ann. § 633:3-a(I)(a). "'Course of conduct' means [two] or more acts over a period of time, however short, which evidences a continuity of purpose," and can include "[t]hreatening the safety of the targeted person . . . ." Id. § 633:3-a(II).

Collins's Complaint excerpts the criminal complaint sworn by Officer Whitten on which the arrest warrant was based:

> [T]he Defendant [Collins] did recklessly engage in a course of conduct targeted at Stacia Sower which would cause a reasonable person to fear for her safety and Stacia Sower was actually placed in such fear in that the Defendant did in the elevator of Rudman Hall and then twice more in the basement state that he was, "going to kill that fucking bitch," referring to Stacia Sower . . . .

-15-

Thus, at the very least, the issuing court had before it Officer Whitten's statement about Collins's conduct. This statement provided sufficient information for a prudent person to believe that Collins had threatened Sower's safety at least two times and that Sower did fear for her safety, which would constitute stalking under New Hampshire law.[4] Thus, there was probable cause to issue the arrest warrant.

Because the warrant for Collins's arrest on stalking charges was supported by probable cause, Collins has no plausible entitlement to relief on his invalid warrant claim. Therefore, we affirm the district court's grant of judgment on the pleadings to the defendants on this count.

## D. Due Process

As he did below, Collins argues that Mallory and UNH violated his due process rights in three ways. First, he argues that the defendants improperly deprived him of a property interest by suspending him with pay. Second, he argues that the defendants deprived him of his liberty interest in entering the UNH campus when they imposed the campus ban. Finally, he argues that the defendants improperly deprived him of a property interest by removing him from his position as department chair. We address these arguments in turn.

---

[4] Notably, Collins does not suggest that any of the documents before the issuing court might have challenged the credibility of Officer Whitten's statement.

-16-

## 1. Suspension with Pay

In <u>Cleveland Board of Education</u> v. <u>Loudermill</u>, the Supreme Court noted that the "root requirement" of the Due Process Clause was "that an individual be given an opportunity for a hearing <u>before</u> he is deprived of any significant property interest." 470 U.S. 532, 542 (U.S. 1985) (quoting <u>Boddie</u> v. <u>Connecticut</u>, 401 U.S. 371, 379 (1971)). Collins argues that his suspension with pay violated his due process rights because he was not given any sort of hearing prior to being suspended.

The district court ruled that because Collins was suspended <u>with</u> pay, he was not deprived of any property interest, and therefore was not entitled to pre-suspension process. In so ruling, the district court relied on our opinion in <u>Torres-Rosado</u>, in which we explained that "a government employer who wishes to remove a worker immediately may suspend that worker with pay until the procedures associated with termination can be completed." 335 F.3d at 9 (citing <u>Loudermill</u>, 470 U.S. at 544-45). In <u>Torres-Rosado</u>, the plaintiff, an employee of the government of Puerto Rico, was suspended with pay for insubordination without a prior hearing and then terminated five months later. <u>See</u> 335 F.3d at 8. We held that because the suspension "caused only a very temporary deprivation of job functions and no financial loss, [it] did not

-17-

give rise to any constitutional entitlement to due process." Id. at 10.[5]

We agree with the district court that Torres-Rosado controls here. Determining what process is due requires balancing three factors: "'[f]irst, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest.'" Gilbert v. Homar, 520 U.S. 924, 931-32 (1997) (quoting Mathews v. Eldridge, 424 U.S. 319, 335 (1976)). Here, Collins has an interest in

---

[5] Collins argues that our statement in Torres-Rosado that a government employer may suspend a worker with pay is based on an improper reading of Loudermill. In Loudermill, the Supreme Court held that prior to being terminated for cause, a public employee must be given some opportunity to respond to charges. 470 U.S. at 547-48. The Court stated in dicta that "in those situations where the employer perceives a significant hazard in keeping the employee on the job, it can avoid the [due process] problem by suspending with pay." Id. at 544-45 (emphasis added). Relying on this dicta, Collins argues that UNH was required to find that he was a "significant hazard" in order to suspend him without first giving him process. Collins contends that he was denied due process because UNH did not consider whether he was a "significant hazard" before suspending him. He further argues that UNH could not have found him to be a hazard given that many faculty members stated that they did not think he was dangerous.

Collins reads too much into the above-quoted sentence from Loudermill. We do not read the Court's language to be stating that a finding of hazardousness is a prerequisite to suspending an employee with pay. Rather, we interpret the Court's language as simply noting two uncontested points: (1) that a government employer has the general authority to impose a paid suspension without a prior hearing; and (2) that the employer can exercise this authority if it perceives an employee to be hazardous.

-18-

receiving his pay, but that interest was minimally affected, if at all: there was only a "very temporary deprivation of job functions and no financial loss." Torres-Rosado, 335 F.3d at 10. Therefore, there was no "deprivation" of any interest that would entitle Collins to any process prior to suspension.[6]

We did suggest in Torres-Rosado that "a very long or open-ended paid suspension might function so much like a termination that some due process protection might attach." 335 F.3d at 10 n.8. However, as in Torres-Rosado, "[w]e need not consider that prospect here." Id. The initial suspension with pay went into effect on June 29, 2007. Collins was then given multiple opportunities to be heard orally and in writing. Finally, on September 10, 2007, Mallory decided that Collins's behavior warranted continued suspension until Collins fulfilled certain requirements. Thus, Collins was only subject to suspension without process (as opposed to suspension with process) for approximately two months. This is shorter than the five-month suspension in Torres-Rosado, which we found to be too short to raise due process

---

[6] In Gilbert, the Supreme Court applied this test and unanimously rejected a due process challenge to a university's decision to immediately suspend a police officer without pay after the officer was arrested on drug charges. See 520 U.S. at 934. Here, the balance of the Mathews factors weighs at least as strongly in favor of the government, if not more so. Unlike in Gilbert, the suspension here was with pay; thus, there was minimal harm to Collins's interest. In contrast, UNH had a strong interest in maintaining order and decorum on campus, an interest that Collins clearly disturbed.

-19-

concerns.  We thus agree with the district court that Collins was not entitled to pre-suspension process.[7]

## 2. Ban from Campus

The district court found that Collins's liberty interest in "tending to his campus laboratory [and] mentoring his graduate students" was co-extensive with his property interest in his position, and thus held that Collins was not entitled to pre-ban process.  Collins does not challenge this conclusion on appeal.  However, the court also found that to the extent Collins had a liberty interest in coming to the campus for non-work purposes, he was not deprived of it because the ban was (1) "temporary and lifted by the University after its investigation" and (2) "subject to exceptions for plaintiff's 'legitimate needs.'"  Collins challenges the district court's characterization of the ban, noting that (1) the ban remained in place until January of 2008, whereas UNH's investigation concluded in September of 2007; and (2) he was denied entry onto the campus on November 16, 2007 to attend a seminar given by his graduate student.

The record shows that Collins was given permission to enter the campus at least nine times during his suspension, whereas Collins can identify only one occasion in which permission was

---

[7] Our result is consistent with "[n]umerous courts [that] have held that paid suspensions could be imposed without the sorts of procedures the Constitution demands for terminations of career employees who have proprietary interests in their jobs." Torres-Rosado, 335 F.3d at 10 n.8 (collecting cases).

-20-

denied.  A single denial of permission is not a deprivation sufficient to give rise to any right to a pre-ban process.[8]

Moreover, even assuming _arguendo_ that Collins was deprived of some liberty interest, the record shows that UNH gave him adequate process.  Mallory initially banned Collins on June 29, 2007, the day after the incident.  Given Collins's behavior and UNH's strong interest in order and safety, Collins had no right to notice or a hearing prior to the initial ban.  Mallory confirmed the ban on September 10, 2007, after the University's investigation and after Collins had been given multiple opportunities to be heard in writing and in person.  Thus, Collins was given adequate process before the longer-term ban went into effect.

### 3. Loss of Department Chair Position

Collins claims that the University did not give him adequate notice of the charges against him or of the possibility that he could lose his department chair position before permanently stripping him of the position.  Collins points to our decision in Cotnoir v. University of Maine Systems, in which we held that if a government employee faces loss of a protected interest, the employee must be given "notice of both charges against an employee[] and the proposed action based on those charges . . . ."

---

[8]  Furthermore, the single event Collins was prevented from attending was an academic event.  Thus, his liberty interest in attending this event was arguably co-extensive with his property interest in his position.  As discussed _supra_, the deprivation of this interest did not violate Collins's due process rights.

-21-

35 F.3d 6, 11 (1st Cir. 1994) (citing Loudermill, 470 U.S. at 543-46).

The record clearly shows that Collins had notice of both the charges against him and the possible sanctions. UNH sent a letter to Collins on June 29, 2007 informing him that he was being suspended from his "duties as associate professor and department chair of Biochemistry and Molecular Biology" pending review of "the circumstances surrounding [his] arrest on criminal charges relating to behavior alleged to have occurred on campus." Moreover, the letter said that the University would "determine what, if any, further response may be warranted." Therefore, Collins was clearly on notice that he was subject to sanction for his outburst on June 28, 2007. Moreover, while the letter does not explicitly state that Collins could lose his position as department chair permanently, the reference to "further action," coupled with the initial suspension of his department chair position, placed Collins on notice that a permanent loss of that position was possible. Cf. O'Neill v. Baker, 210 F.3d 41, 49 (1st Cir. 2000) (stating that in context of termination for poor performance, "there is no specific due process requirement that an individual know, prior to a contemplated action hearing, precisely what action is contemplated where there has been prior notice that termination could result if there were no improvement").

## E. Defamation

Collins argues that in granting summary judgment to the defendants on the defamation claim, the district court wrongly decided fact questions that should have been left to the jury. "[W]e must reverse [a grant of summary judgment] if we find that plaintiffs have established a genuine issue of material fact that a reasonable jury could resolve in their favor." Coffin v. Bowater, Inc., 501 F.3d 80, 97 (1st Cir. 2007) (emphasis added). We find that no reasonable jury could have found for Collins on his defamation claim.

Under New Hampshire law, defamation requires proof that the defendant "failed to exercise reasonable care in publishing, without a valid privilege, a false and defamatory statement of fact about the plaintiff to a third party." Indep. Mech. Contractors, Inc. v. Gordon T. Burke & Sons, Inc., 635 A.2d 487, 492 (N.H. 1993) (emphasis added). "[W]ords alleged to be defamatory must be read in the context of the publication taken as a whole." Duchesnaye v. Munro Enters., Inc., 480 A.2d 123, 125 (N.H. 1984). "A statement is not actionable if it is substantially true." Simpkins, 661 A.2d at 776. Moreover, even if a statement is false, a qualified privilege exists if it was "published on a lawful occasion, in good faith, for a justifiable purpose, and with a belief, founded on reasonable grounds of its truth, provided that the statement[] [is]

-23-

not made with actual malice." Id. at 777 (internal quotation mark omitted).

Collins contends that the statement, "[a]nyone who sees Dr. Collins anywhere on campus should avoid contact with him and immediately notify the UNH Police Department," defamed him because it implied he was "armed and dangerous." This statement appeared in an email to COLSA faculty and staff informing them of Collins's arrest and ban from campus. The email also included a press release stating that Collins had voluntarily turned himself in on the arrest warrant and had been released on $2,500 bail. Thus, no reasonable juror, reading the challenged statement in the context of the email as a whole, could have interpreted it to mean that Collins was "armed and dangerous."

At most, as the district court found, the statement might have implied that Collins was dangerous. Yet even assuming that the email implied Collins was dangerous, and assuming this implication was false, the defendants were clearly privileged in making the statement. The email was sent on a lawful occasion, and the record shows that UNH officials made a good-faith decision to proactively publicize the incident. Given that Collins had been banned from campus for an incident involving violence against property and a threat of violence against another person, UNH had a justifiable purpose in instructing anyone who saw him to avoid him and inform the police. Finally, given Collins's behavior, the

-24-

University had a reasonable ground for believing Collins could be dangerous.[9]  Moreover, there is no evidence in the record that the defendants acted with malice.  Thus, no reasonable jury could have found that the privilege did not apply, and hence summary judgment was proper.[10]

### III.  Conclusion

The judgment of the district court is affirmed.

**Affirmed**.

---

[9]  Collins accuses UNH of "administrative hysteria" for viewing him as a potential danger, and notes that on the morning of June 29, 2007, before Mallory had the email sent, Cote and Manello met with Mallory to say that Collins was not dangerous.  However, given that Collins kicked a trash can and publicly said he could kill a colleague over a parking ticket, we find Collins's protest unpersuasive.  It is also important to recall that this incident occurred just months after the shooting at Virginia Tech, which, as the record reflects, put UNH officials on heightened alert for campus violence.

[10]  Collins's contention that the question of qualified privilege must always be left to a jury at trial is flatly wrong.  Ordinarily, the question of whether the privilege applies is a question of fact.  See Pickering v. Frink, 461 A.2d 117, 119 (N.H. 1983) (citing McGranahan v. Dahar, 408 A.2d 121, 123 (N.H. 1979)).  However, the purpose of summary judgment is "to pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required."  McCarthy v. Nw. Airlines, Inc., 56 F.3d 313, 314 (1st Cir. 1995).  Where, as here, no reasonable jury could have found that the privilege did not apply, a trial is not necessary.